[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11048
_____

D.C. Docket No. 2:15-cv-00033-LGW-RSB


JULIAN ALMANZA,
Individually, and on behalf of all others similarly situated,
ALEJANDRO DAVISON,
Individually, and on behalf of all others similarly situated,
NICOLAS ARROYO,
Individually, and on behalf of all others similarly situated,
AIDA PEREZ,
Individually, and on behalf of all others similarly situated,
ANA ESCOBAR,
Individually, and on behalf of all others similarly situated,
MIGUEL OROZCO,
Individually, and on behalf of all others similarly situated,

Plaintiffs - Appellants,


versus

UNITED AIRLINES, INC.,
A corporation,
DELTA AIR LINES, INC.,
AMERICAN AIRLINES, INC.,
 A corporation,
AEROVIAS DE MEXICO, S.A. DE C.V.,
A corporation,
CONCESIONARIA VUELA COMPANIA DE AVIACION, S.A.P.I. DE C.V.,

ABC AEROLINEAS, S.A. DE C.V.,
A corporation,
U.S. AIRWAYS, INC.,

                                                    Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(March 13, 2017 )

Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and UNGARO,[*] District Judge.

ROSENBAUM, Circuit Judge:

Some find travel taxing.  Plaintiffs in this case are among them, but not for the usual reasons.  Plaintiffs are Mexican nationals who, in flying with the Defendant airlines to and from the United States and Mexico, were charged, as part of their airfare, a tourism tax purportedly required under Mexican law, even though Defendants knew that, under Mexican law, Plaintiffs were actually exempt from the tax.  Defendants kept those improperly collected "taxes" for themselves instead of remitting them to Mexico (to which they were not owed) or back to Plaintiffs (who technically could have utilized an obscure reimbursement procedure to get their money back, if only they knew about it).

_____

[*] Honorable Ursula Ungaro, United States District Judge for the Southern District of Florida, sitting by designation.

2

Plaintiffs claim Defendants defrauded them, but because of the unique contours of federal aviation law,[1] Plaintiffs assert that they are left with no hopeful route to relief other than the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68.  Those who successfully navigate RICO's complexities are compensated with treble damages and attorney's fees, among other remedies.  In this case, though, the district court dismissed Plaintiffs' RICO claims on the pleadings.  Because Plaintiffs failed to plead a RICO enterprise, we affirm the district court's dismissal.

## I.

## A.[2]

Before we embark on our journey through Plaintiffs' RICO allegations, some background knowledge is necessary.  Defendants are international air-transportation companies that transport passengers to and from the United States and Mexico.  To facilitate their business in Mexico, Defendants all became, at one point or another, members of the Mexican legal entity Cámara Nacional de

---

[1] Defendants asserted at oral argument that Plaintiffs have no conceivable private civil remedy other than RICO because the Department of Transportation exclusively regulates the disclosure of charges on airline tickets.  We impart no view on the availability of other remedies to Plaintiffs other than to note that, in *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220 (11th Cir. 2014), we held that, although the Airline Deregulation Act of 1978 ("ADA") expressly preempted state laws, neither the Federal Aviation Act nor the ADA precluded RICO claims based on allegedly fraudulent airfares.

[2] The allegations in this section are taken from Plaintiffs' original complaint, unless otherwise noted.  Since we review the district court's order granting dismissal, we accept the allegations as true and draw all reasonable inferences in Plaintiffs' favor.  *See Strickland v. Alexander*, 772 F.3d 876, 882 (11th Cir. 2014).

Aerotransportes ("CANAERO").  Members of CANAERO use CANAERO as a means of coordinating Mexico-related airline matters with each other and with Mexican authorities.  Towards this end, "[e]ach of the Defendants regularly participates in meetings with each other and various Mexican authorities under the aegis of CANAERO."

Mexico imposes a tax (the "Mexico Tourism Tax" or "Tax") on certain travelers who arrive in Mexico on flights that originated outside of Mexico. Among those legally exempt from the Tax are Mexican nationals and children under the age of two.  Because Defendants transport passengers to and from Mexico and the United States, Defendants' businesses are affected by the Tax.

To facilitate collecting the Tax, Mexico, Defendants, other non-party airlines, and CANAERO itself entered into an agreement (which we refer to as the "Contract") so that the parties could, among other things, implement procedures allowing the airlines to collect the tax from the passengers who owed it.[3] Plaintiffs believe their Complaint to be the first instance in which the Contract was made public, and they allege that CANAERO and Defendants had actively tried to keep the Contract secret.

---

[3] Plaintiffs explain in their proposed amended complaint that, by taking on the obligation to collect the Mexico Tourism Tax on behalf of Mexico, the airlines made their passengers' trips "easier and hassle-free."

4

The Contract expressly designated so-called "Exempt Travelers," from whom the CANAERO member airlines could not collect the Mexico Tourism Tax. These Exempt Travelers are "citizens of Mexico, children under the age of two, and foreigners with resident status in Mexico." Defendants were not authorized to and agreed not to collect the Mexico Tourism Tax from them. Plaintiffs and the class they hope to represent are Exempt Travelers.

Through the Contract, Defendants agreed to procedures by which they would remit to Mexico the Mexico Tourism Tax that they collected from passengers who owed it. For example, one of these procedures required Defendants to fill out and submit to Mexico manifest forms showing the number of passengers per flight to whom the tax applied.

But according to Plaintiffs, Defendants did not simply collect the Tax from only the passengers who legally owed it; rather, Defendants collected the tax from all passengers, including Exempt Travelers. In fact, Plaintiffs complain that Defendants took them for a ride, representing to the Exempt Travelers that they were required to pay the Tax, even though Defendants knew that not to be true. Plaintiffs allege that Defendants accomplished this by not including the Tax on the "face of the tickets," instead "bur[ying it] in the details of the costs and fees of each ticket" as a line item and then not advising Exempt Travelers that they were

5

entitled to a refund.[4]   The amount of the Tax varied, but it was usually between $20.00 and $25.00.   Plaintiffs allege that this ticketing practice was an illegal, multi-year, multi-million dollar scheme.

In Plaintiffs' view, not only did this practice defraud customers, but it also violated the Contract: Defendants were obligated to have in place procedures to identify Exempt Travelers so that only non-exempt passengers would be taxed, and Defendants also agreed to provide refunds to any passengers who were improperly taxed.   Plaintiffs further claim that, despite possessing adequate information to ensure no passenger would be improperly taxed (*i.e.*, having passengers' passport numbers and nationalities), Defendants "([i]) charged Exempt Travelers the Mexico Tourism Tax, (ii) concealed from Exempt Travelers that they were not subject to the Mexico Tourism Tax, (iii) failed to offset ticket prices charged for such Exempt Travelers, and (iv) failed to refund the tax."   On top of that, Plaintiffs contend that Defendants retained the improperly assessed taxes and reinvested the proceeds into their respective operations.

Finally, Plaintiffs complain that Defendants engaged in tactics to obfuscate their alleged scheme.   According to Plaintiffs, their injuries were difficult to discover because (1) separate and apart from the Contract, Defendants had an

---

[4] Plaintiffs allege in their proposed amended complaint that though Defendants technically had refund procedures, the refund policies were so byzantine that they were "illusory," and intentionally so, for they allowed the Defendants to keep the improperly collected taxes in their own coffers.

agreement among themselves, whether express or implied, to create and perpetrate their fraudulent tax-collection practices as a collective scheme, and (2) Defendants in fact carried out this illicit side agreement over many years.

**B.**

Plaintiffs filed their Complaint in March 2015. They bring their claims under RICO, which provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962, in turn, lists four types of RICO violations. *See id.* § 1962. Plaintiffs assert they have suffered violations of three of these provisions: § 1962(c), which proscribes participating in the conduct of the affairs of an enterprise engaged in interstate commerce, through a pattern of racketeering activity (Count One); § 1962(a), which prohibits investing income gained from a pattern of racketeering activity into such an enterprise (Count Two); and § 1962(d), which renders conspiracy to violate § 1962(a), (b), or (c) a crime (Count Three). The predicate acts making up the pattern of racketeering activity for these claims are violations of the federal mail and wire-fraud statutes, 18 U.S.C. §§ 1341, 1343.

Defendants filed motions to dismiss the complaint for failure to state claims under RICO, among other reasons. The district court heard oral argument on the motions, after which the court invited the parties to submit supplemental briefing.

In the supplemental briefing, Plaintiffs requested leave to amend and filed a proposed amended complaint, adding details about Defendants' relationships with CANAERO.  The new allegations pled in that proposed amended complaint are discussed below as necessary.

Ultimately, the district court granted the motions to dismiss, denied Plaintiffs leave to amend on the basis that the proposed amended complaint was futile, and dismissed the case with prejudice.  The court determined that Plaintiffs failed to plead the existence of a RICO "enterprise" or a "pattern of racketeering activity."  Because the court also found that the additional allegations in the proposed amended complaint did not remedy the deficiencies, it dismissed the case with prejudice.[5]

## II.

A district court's dismissal of a complaint with prejudice for failure to state a claim is subject to a *de novo* standard of review.  *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010).  We must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff, *see Strickland*, 772 F.3d at 882, but the allegations must nevertheless state a claim for relief that is plausible—and not merely possible—on its face, *see*

---

[5] Defendants had asserted separate grounds for dismissal, including other arguments for why plaintiffs failed to state RICO claims, as well as arguments raising issues such as failure to join a party and improper venue.  For these arguments, the court either summarily found them meritless or simply declined to consider them since it was dismissing the case, anyway.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Under this standard, "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

### III.

Plaintiffs bring their claims under RICO's private cause of action, 18 U.S.C. § 1964(c).  To state a claim for relief under § 1964(c), a plaintiff must plead facts establishing three elements: (1) a violation of 18 U.S.C. § 1962; (2) injury to business or property; and (3) causation.  *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

As we have noted, § 1962, in turn, outlaws various kinds of racketeering conduct: subsection (a) prohibits investing income gained from a pattern of racketeering activity into an enterprise engaged in interstate commerce; subsection (b) forbids using a pattern of racketeering activity to acquire or maintain any interest in or control over such an enterprise; and subsection (c) proscribes participating in the conduct of the affairs of such an enterprise through a pattern of racketeering activity.  *See Pelletier v. Zweifel*, 921 F.2d 1465, 1495-96 (11th Cir. 1991), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).  Subsection (d) criminalizes conspiring to violate subsections (a), (b), or (c).  *See Pelletier*, 921 F.2d at 1496.

Plaintiffs sought relief under subsections (a), (c), and (d).  Each of these subsections requires Plaintiffs to have alleged the existence of an "enterprise"— subsections (a) and (c) require this explicitly, *see* 18 U.S.C. § 1962(a), (c), and subsection (d) requires it implicitly by virtue of incorporating the elements of subsection (c).  *See United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995).  Though Plaintiffs make a strong effort to sufficiently allege the existence of an "enterprise," they ultimately fail.

### A.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  In the simple case, the enterprise is an "individual, partnership, corporation, association, or other legal entity."  *Id.*  The more challenging case occurs when the enterprise is alleged to be a "union or group of individuals associated in fact although not a legal entity."  *Id.*  Plaintiffs rely on this more challenging "association in fact" form to defend all three of their claims.

An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  While "the very concept of an association in fact is expansive," the Supreme Court has nevertheless found that an association-

in-fact enterprise must have three "structural features": (1) a "purpose," (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 944, 946 (2009). As a result, an associated-in-fact enterprise can be either "formal or informal," as long as the enterprise's "various associates function as a continuing unit." *Turkette*, 452 U.S. at 583; *see also United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) (explaining that how "loose or informal" an enterprise is makes no difference, as long as the enterprise "furnishes a vehicle" for the racketeering activity).

## B.

Turning to the complaint, Plaintiffs' enterprise theory is that, through an illicit agreement, Defendants formed an enterprise among themselves to commit their racketeering. There is no question that Plaintiffs adequately plead two of the three minimum structural requirements for an associated-in-fact enterprise: a "purpose" and "longevity sufficient to permit the[] associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. What the parties really dispute is whether Plaintiffs adequately plead "relationships among those associated with the enterprise." *Id.* If this association-in-fact enterprise does not have sufficient relationships among Defendants as associates, it lacks the structure needed to be legally cognizable.

Proving sufficient relationships for an associated-in-fact enterprise is not a particularly demanding task, but the endeavor can be elusive. For example, an associated-in-fact enterprise "need not have a hierarchical structure or a 'chain of command,'" and its "decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." *Boyle*, 556 U.S. at 948. The enterprise does not have to give its members fixed roles, nor does it need to have "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.* Nevertheless, "the group must function as a continuing unit." *Id.*

To show that Defendants acted as a continuing *unit*, and not merely independently, Plaintiffs conclusorily allege that Defendants entered into an agreement, either express or tacit, to collect the Mexico Tourism Tax from Exempt Travelers, and that this alleged agreement "is itself an association in fact." But since Defendants do not allege facts showing that this alleged agreement actually exists, their allegations simply recite a legal conclusion—the existence of an agreement. So they are inadequate for pleading purposes. *See Twombly*, 550 U.S. at 564 ("Although in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions . . . ." (footnote omitted)).

Plaintiffs surely recognize this because their real argument is that the Court should infer an agreement—and thus an enterprise—from the parallel conduct of

12

Defendants.  And Plaintiffs have indeed alleged parallel conduct:  according to the complaint, each Defendant represented to the Exempt Travelers that they were required to pay the Tax and concealed from them that they were exempt; each charged them the Tax; each did not offset ticket prices for the Exempt Travelers; and each failed to refund the Tax.

But parallel conduct alone cannot support a plausible inference of an agreement.  In *Twombly*, the Supreme Court rejected as inadequate the conclusory allegation of a conspiratorial agreement, despite the fact that the allegation was coupled with allegations of parallel conduct.  Parallel conduct, the Court explained, can just as easily indicate "independent action" as it can collusion.  *See Twombly*, 550 U.S. at 556-57.  To cross the line from a possible to a plausible existence of an agreement, plaintiffs must allege a "further circumstance pointing toward a meeting of the minds."  *Id.* at 557.  Without that "further factual enhancement," "an account of a defendant's commercial efforts stays in neutral territory."  *Id.*

In *American Dental*, we determined that, even though *Twombly* was an antitrust case, *Twombly*'s pleading rule for agreements applied in the RICO context.  *See* 605 F.3d at 1291.  There, the plaintiffs alleged that each of the defendant-insurers processed x-ray billing codes in the same fraudulent manner and that, given this parallel conduct, the defendants were part of a RICO conspiracy.  *See id.* at 1292-93.  We held that the plaintiffs failed to plead a

13

conspiratorial agreement because they did not allege specifically *how* the defendants agreed to employ the allegedly fraudulent billing procedures as part of a scheme. *See id.* In other words, the plaintiffs had to assert allegations explaining how exactly the defendants went about entering into an agreement with each other. It wasn't enough that the defendants all ended up doing the same fraudulent thing.[6] That's precisely the problem that burdens Plaintiffs here.

And it's not just unknowingly parallel conduct that fails to pass the plausibility threshold. *Twombly*'s rule extends to consciously parallel conduct as well. Conscious parallelism occurs when competitors engage in similar behavior and are aware of each other's behavior. As a result of this awareness, competitors also know that what one competitor can do depends on what the others do—this, in turn, creates interdependence.

In *Twombly*, the Supreme Court found conscious parallelism and interdependence insufficient to pass the plausibility threshold, *see* 550 U.S. at 553-54, and we, too, have recognized this principle, *see Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342-43 (11th Cir. 2010); *see also In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 875 (7th Cir. 2015) (citing the airline industry, and

---

[6] While an "enterprise" and a "conspiracy" are distinct RICO elements (and the latter only an element in a conspiracy claim), the elements are analogous insofar as an enterprise may be premised on the existence of an agreement, and conspiracy requires an agreement. To that extent, then, the *Twombly* parallel-conduct pleading standard, which was developed for the "agreement" element of a Sherman Act § 1 conspiracy claim, applies equally to both RICO enterprise and RICO conspiracy allegations.

in particular its ticket-pricing practices, as an example of a "concentrated market[ in which competitors] watch each other like hawks"), *cert. denied, Aircraft Check Servs. Co. v. Verizon Wireless*, 136 S. Ct. 524 (2015).  Although parallel conduct and interdependence are consistent with collusion, they are "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Twombly*, 550 U.S. at 554.

Plaintiffs argue that they have alleged not simply consciously parallel conduct, but rather consciously parallel conduct plus multiple "further factual enhancement[s]."  *Id.* at 557.  We now turn to those purported "further factual enhancement[s]" to discern whether any makes the alleged agreement plausible by *Twombly* and *Iqbal* standards.

### 1.  Unlawful Conduct

For a first factual enhancement,[7] Plaintiffs posit that, while the Court in *Twombly* held that lawful parallel conduct alone cannot give rise to an inference of collusion, the Court said nothing about what inferences may arise when *unlawful* parallel conduct has occurred.  So in Plaintiffs' view, if Defendants have engaged in parallel conduct that is unlawful, the unlawfulness of the parallel conduct

---

[7]  Although Plaintiffs present these factual enhancements discretely, Plaintiffs nevertheless object to Defendants' method of analyzing each discrete enhancement independently of the other enhancements.  Of course, the Court may consider these enhancements holistically in its final assessment, but we must first reject any enhancement that is not cognizable under the law.

provides the further factual enhancement needed to support a plausible inference of an agreement.

To be more specific, though, Plaintiffs do not propose that the unlawful predicate acts making up the pattern of racketeering activity can serve double duty as the unlawful parallel conduct constituting the further factual enhancement—this would amount to bootstrapping of separate elements of the RICO cause of action. Instead, Plaintiffs theorize that if Defendants have engaged in unlawful parallel conduct in addition to the predicate acts underlying the pattern of racketeering activity, that additional unlawful parallel conduct allows us to infer a plausible agreement. So since Defendants all breached the Contract with Mexico, and Defendants' breaches were unlawful, Plaintiffs urge, those breaches serve as a further factual enhancement to make the existence of an agreement plausible.

As an initial matter, Plaintiffs take the *Twombly* Court's use of the term "lawful" out of context. In *Twombly*, the Court alternated between the terms "lawful" and "independent" because, in the context of that case, the terms were synonymous: if economic conduct is independent (meaning not collusive), it is lawful under § 1 of the Sherman Act. So the Court in *Twombly* was not commenting on the legality of the parallel conduct outside of the antitrust context when it employed the term "lawful."

16

Second, Plaintiffs' allegations of unlawful parallel conduct, at least under the facts of this case, are still just allegations of parallel conduct. Plaintiffs contend that, before any Defendants could commit the predicate acts of tricking customers into paying a tax they didn't owe, Defendants first had to enter into and then secretly breach the Contract, for the Contract gave them the power to collect the Tax in the first place. Because, in Plaintiffs' view, this conduct involved two unlawful acts—breaching the Contract and defrauding Exempt Travelers out of the monies purportedly collected for the Tax—Plaintiffs argue that the conduct provides the further factual enhancement needed to make the enterprise plausible.

But even if all Defendants breached the Contract, those breaches were parallel conduct just as much as the fraudulent ticketing practices were parallel conduct. The fact that each Defendant engaged in the same two-step sequence in committing fraud does not suggest a meeting of the minds any more than it suggests independent action, particularly because in order to keep the allegedly inappropriately collected tax, each Defendant necessarily first *had* to enter the Contract empowering it to collect the tax.

Plaintiffs' theory does nothing more than characterize one single type of unlawful conduct—here, the fraudulent collection of the Tax—as two discrete unlawful acts by breaking it down into its component parts so that each component part can be reframed as a separate, unlawful parallel act. In fact, that is exactly

17

how Plaintiffs argue this issue.  Later in their brief, they assert as additional factual enhancements the allegations that Defendants breached the contracts in the same way, defrauded Plaintiffs and the class in the same way, provided information regarding the Tax to the Mexican government in the same way, and chose not to give improperly collected taxes to Mexico.

We have already found this tactic unavailing.  In *American Dental*, a group of dentists alleged that dental insurance companies, by engaging in fraudulent claim-processing practices, had been withholding portions of reimbursements lawfully owed to the dentists for dental services rendered under managed-care plans.  *See* 605 F.3d at 1286 & n.1.  The dentists claimed that the insurance companies were liable under RICO for violating §§ 1962(c) and (d).  *See id.* at 1287.

Applying *Twombly*, we held that the dentists failed to adequately plead a conspiratorial agreement under § 1962(d) because at most, they alleged that the insurance companies had engaged in parallel conduct.  *See id.* at 1293-96.  This was so even though the dentists had averred multiple discrete acts of allegedly parallel conduct.  *See id.* at 1294.  In particular, we noted that "the collective development and use of automated processes to manipulate [Current Dental Terminology] codes, *i.e.* downcoding and bundling; the use of the same claims procedures, including the data that dentists are required to provide in submitting

18

claims, the forms on which dentists must submit their data, and the coding that dentists use to submit their data; and Defendants' participation in trade associations and private, jointly owned partnerships and corporations" do not show a meeting of the minds. *Id.*

Indeed, we found that, as in *Twombly*, there was an "'obvious alternative explanation' for each of the collective actions alleged that suggest[ed] lawful, independent conduct." *Id.* (citation omitted). Here, Plaintiffs' "unlawful parallel conduct" theory fails for the same reason. And although Defendants' alleged breaches of the Contract with Mexico may have been "unlawful" in the sense that they violated an agreed-upon contract (and we do not condone such activity), we cannot say they were economically irrational so as to explain away parallel conduct—which brings us to Plaintiffs' next argument.[8]

### 2. Non-Competitive Conduct

Plaintiffs argue that the parallel conduct in *Twombly* did not support a plausible inference of an agreement because the conduct was "pro-competitive," whereas here, Defendants' conduct was allegedly "non-competitive" and therefore suggestive of collusion. Specifically, Plaintiffs aver that, by charging the Mexico

---

[8] One last note while we're on the topic of unlawful conduct: Plaintiffs find it suspect that Defendants have not given an explanation for their behavior. Yet under Rule 12(b)(6), Defendants must explain only why Plaintiffs' allegations are not plausible; Defendants are not required to affirmatively identify and justify what they actually did. What's more, on a Rule 12(b)(6) motion, Defendants cannot proffer additional factual allegations without implying that their motion should be converted into a motion for summary judgment. Fed. R. Civ. P. 12(d).

Tourism Tax, Defendants could not have been pursuing any reasonable economic goal, for the only *economically* rational course of action was to either (a) not charge the Tax and thereby "undercut" the other airlines, or (b) report the other Defendants to the proper authorities. Defendants respond that it seems just as, if not more, likely that the economically rational move for any airline was to charge the Tax and thereby increase profits.

And there lies the heart of the problem: Plaintiffs have not explained why their economic model should be accepted as plausible. On a Rule 12(b)(6) motion to dismiss, the Court does not accept as true unwarranted deductions of fact. *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005). In our Circuit, this general principle has special force when it comes to economic theories: the rule is that "a conclusory market model that is stated at a very high order of abstraction" cannot plausibly suggest an injury for purposes of RICO. *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014).

And if it cannot plausibly suggest an injury, it cannot plausibly suggest an agreement, either. We already found as much in *American Dental* when we declined the plaintiffs' invitation to infer that a conspiratorial agreement existed based on the plaintiffs' unsubstantiated hypothesis that the defendants could not have accomplished their fraudulent schemes individually without having colluded with each other. *See* 605 F.3d at 1294 (citing *Sinaltrainal v. Coca-Cola Co.*, 578

F.3d 1252, 1268 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702 (2012); *Twombly*, 550 U.S. at 566).

### 3.  CANAERO

Plaintiffs cite Defendants' memberships in CANAERO and the activities they conducted in connection with CANAERO as further factual enhancements making the existence of an agreement plausible.  Of course, alone, membership in a trade organization like CANAERO does not make Defendants part of an enterprise.   In *American Dental*, we held that mere participation in trade organizations does not render plausible the existence of a conspiratorial agreement. *See* 605 F.3d at 1295.

So Plaintiffs also assert that Defendants used CANAERO to further their fraudulent scheme.  They base their theory on their allegations that Defendants all responded in the same way to three separate individuals who were either associated with CANAERO or interacted with it.

In this respect, the proposed amended complaint avers that CANAERO was both the entity with which and, in a figurative sense, the place at which, Defendants had substantive discussions about collecting the Mexico Tourism Tax. The allegations, construed in the light most favorable to Plaintiffs, show that before negotiations on the Contract began, certain Defendants met with Gabriel Ortega Alcocer (referred to in the briefing as "Alcocer"), the Managing Director of

21

CANAERO, on numerous occasions to discuss the Tax. During the discussions, Defendants acknowledged that it would be in their collective best interest to be able to collect the Tax from passengers. Then, through the course of the negotiations leading up to the Contract, certain Defendants, Alcocer, and the Mexican government came to the mutual understanding that the Contract prohibited Defendants from assessing the Tax against Exempt Travelers.

After the Contract was executed, however, Alcocer had to discuss tax collection with the Defendants, both in regular group meetings and in private conversations, because he feared that Defendants were collecting the Tax from Exempt Travelers in disregard of the Contract. Through these meetings and discussions, Defendants learned what the other Defendants were doing with respect to the Tax and also found out that Alcocer had been asking all of them why they were improperly collecting the Tax. But despite Alcocer's various inquiries regarding improper collection of the Tax, not one of the Defendants ever gave him a response.

Elizabeth Hernandez Saldivar (referred to in the briefing as "Hernandez"), an official of the National Institute of Migration (abbreviated "INM")—the Mexican agency that collects the Tax—confronted Defendants about the same problem, but they refused to respond to her as well, even though Hernandez was able to find out from non-party airline Mesa Airways that both Mesa and

22

Defendants were indeed charging all passengers the Tax, including Exempt Travelers.

A third individual, Maria Guadalupe Cecilia Romero Castillo (referred to in the briefing as "Romero"), the Commissioner of the INM from 2006 until 2010, confronted Defendants on multiple occasions, beginning in 2007.   To her, however, Defendants allegedly not only admitted they were improperly collecting the tax, but they also promised to stop collecting it from Exempt Travelers.   Yet they did not honor their alleged promises; instead, they continued their improper practices, and every year, Romero confronted them anew and received the same empty promises in response.

Plaintiffs argue that both the repeated silences in response to Alcocer and Hernandez and the repeated confessions to Romero are not simply instances of conscious parallel conduct but are instead instances of collusive conduct.   In support, Plaintiffs point out that Defendants were in the same room on multiple occasions and that they each did the same thing in response to the same stimulus.

But that does not establish an *agreement*; rather, it shows nothing more than parallel conduct.   Viewing the situation through the *Twombly* lens, it makes no difference whether Defendants have engaged in parallel conduct in the same room as each other or in the same economic market as each other, since it was economically rational for each Defendant to remain silent when confronted with its

23

own wrongdoing—especially when, year after year, Defendants kept getting away with what they were doing.

Perhaps recognizing this vulnerability, Plaintiffs suggest another way of looking at their allegations regarding Defendants' responses to Alcocer, Hernandez, and Romero.  For conspiracy, a plaintiff can prove "an agreement on an overall objective" by using "circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Starrett*, 55 F.3d at 1544 (internal quotation marks and citation omitted). Extrapolating conspiracy theory to the concept of an enterprise, Plaintiffs posit that an association-in-fact enterprise can "arise organically over time" in the same way that a conspiratorial agreement can.

But this argument does not appreciate the distinct structural elements of a RICO associated-in-fact enterprise and how that type of enterprise contrasts with a RICO conspiracy.  It may be true that, just as "an agreement on an overall objective" can arise organically in the conspiracy context, associates of an associated-in-fact enterprise could organically reach an understanding of the "purpose" of the enterprise.  An associated-in-fact enterprise, however, must have more to its structure than just a common purpose in accordance with which the

24

associates act—*relationships* between the associates of the enterprise must exist as well.  *See Boyle*, 556 U.S. at 946.

As we have noted, Plaintiffs aver that Defendants' alleged illicit side agreement formed the necessary relationships between them.  But that brings us back to the problem that Plaintiffs have not alleged facts showing that an agreement among Defendants ever existed.  The fact that Defendants acted in parallel simply does not show that they had relationships among each other with respect to the actual carrying out of what they were each doing individually.  Though the concepts of conspiracy and enterprise certainly overlap, the concepts are distinct, and here, the complaint and proposed amended complaint lack allegations establishing the necessary relationships among Defendants.

### 4.  The Contract

Next, Plaintiffs point to the Contract as a further factual enhancement that Plaintiffs believe makes their allegation of an agreement plausible.  They first argue that, because each Defendant used the Contract to advance the fraudulent scheme, the Contract evidences Defendants' illicit side agreement.  But the terms of the Contract say nothing about an illicit enterprise or a fraudulent scheme.  Nor do the terms provide a basis for Defendants to keep the improperly collected tax.  Rather, the Contract shows only that Defendants had an agreement with CANAERO based on the Contract's terms.  In other words, the Contract in no way

evidences a meeting of the minds beyond the meeting of the minds expressed in the Contract's terms, which in and of themselves had nothing to do with the alleged enterprise.

Plaintiffs also make much of the fact that Defendants did not publicly disclose the Contract. But this is hardly suspect under *Twombly*; it is entirely rational for a business to keep the existence of a contract private. Consequently, the fact that not one Defendant disclosed the Contract is just another allegation of merely parallel conduct.[9]

In sum, none of Plaintiffs' "further factual enhancement[s]"—even in conjunction with Plaintiffs' allegations of parallel conduct—suggests the plausible existence of an agreement that would create the necessary structure for a RICO enterprise. In the absence of any allegation plausibly suggesting a meeting of the minds, we must assume that the parallel conduct exhibited by Defendants is just as consistent with independent action (including independent action by actors who are conscious of what the other actors are doing) as it is with an agreement to commit a racketeering scheme. *See Twombly*, 550 U.S. at 554 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide

---

[9] Plaintiffs make arguments about the conduct of certain Defendants in litigation that took place in the Ninth Circuit, but we find those arguments equally unpersuasive, since the relevant conduct was, at most, again simply parallel conduct.

swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." (citation omitted)).  In other words, while it is possible that Defendants agreed to commit a racketeering scheme, it is also possible that all Defendants independently decided it was financially worth it to breach the terms of the Contract, assess the Mexico Tourism Tax against Exempt Travelers, and keep the proceeds for themselves unless a passenger properly requested a refund of what he or she improperly paid.  Under *Twombly* and *Iqbal*, however, only plausible—and not merely possible—claims survive a Rule 12(b)(6) motion to dismiss.

In short, Plaintiffs conclusorily allege the existence of an agreement, whether express or tacit.  But they offer no allegations suggesting the existence of an express agreement.  And while the allegations in support of a tacit agreement are somewhat more developed, they do not paint a plausible picture of an agreement, let alone an enterprise.  The district court therefore properly dismissed Plaintiffs' claims with prejudice.  And the proposed amended complaint did not dictate a different outcome.

## IV.

Plaintiffs argue that the district court erred in denying their request for leave to amend.  The district court denied their request because the proposed amended complaint was futile.  Although we review for abuse of discretion a district court's

27

denial of leave to amend, we review *de novo* a district court's finding that a proposed amendment would be futile. *See Coventry First, LLC v. McCarty*, 605 F.3d 865, 869 (11th Cir. 2010).

As we have described, the proposed amended complaint was indeed futile. Plaintiffs point out that, in this Circuit, a plaintiff usually is allowed at least one chance to amend before a case is dismissed with prejudice. Here, Plaintiffs took advantage of one chance to amend by filing the futile proposed amended complaint.

So Plaintiffs assert that, although they filed the amended complaint after oral argument and with the help of the comments the district court made during oral argument, Plaintiffs never had a chance to propose an amendment after the court issued its order of dismissal. As a result, Plaintiffs argue, they did "not know in advance of the district court's order . . . the particular reasons the district court would provide concerning its decision on the motions to dismiss."

Nothing requires that a plaintiff's presumptive one chance to amend be given after an order of dismissal has been entered, as opposed to before any such order. And in any case, even if a post-dismissal opportunity were required, here, after the district court entered its order of dismissal, Plaintiffs did not request leave to amend to address the concerns in the order, even though Plaintiffs could have done so under Rule 59(e) or Rule 60(b)(6). *See United States ex rel. Atkins v.*

28

*McInteer*, 470 F.3d 1350, 1361 n.22 (11th Cir. 2006).  Nor was the district court in its order of dismissal under an obligation to *sua sponte* give Plaintiffs leave to file a second amended complaint.  *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc).

Perhaps Plaintiffs could argue their way out of futility if, on appeal, they explained how they could cure the faults in the proposed amended complaint.  *See DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1303 (11th Cir. 2008) ("Nor has DiMaio indicated, even on appeal to this Court, what precisely his amended complaint would reveal").  But Plaintiffs' briefing and oral argument did not indicate how they could better plead an enterprise, so we cannot find error in the district court's dismissal with prejudice on that basis.

Finally, Plaintiffs attempt to save their case by invoking Southern District of Georgia Local Rule 9.1, which provides that, if a RICO claim fails to "specifically state each alleged violation," then, "upon motion duly made by any party to the proceeding, such pleading shall be dismissed without prejudice by the Court."  But Local Rule 9.1 does not say that a pleading shall be dismissed without prejudice if the RICO claim fails to state a claim for any reason—the Rule applies only if the RICO claim fails to "specifically state each alleged violation."  Here, Plaintiffs' RICO claims were dismissed for many reasons, including reasons having nothing

29

to do with a lack of specificity—such as failure to plead the plausible existence of an enterprise.  So we find no error under the local rules.

## V.

As alleged by Plaintiffs, Defendants' conduct regarding the Mexico Tourism Tax is very troubling.  But the pleadings in this case are simply insufficient to allow RICO to serve as a vehicle for addressing that conduct.  Dismissal was therefore warranted.

**AFFIRMED.**