[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-15014

_____

D.C. Docket No. 1:19-cv-00040-ECM-JTA

TRIP WHATLEY,
SUSAN MOORE,
TRACY LENTZ,

                                            Plaintiffs - Appellants,

KEITH BOWERS, et al.,

                                            Plaintiffs,

versus

THE OHIO NATIONAL LIFE
INSURANCE COMPANY,
OHIO NATIONAL LIFE ASSURANCE
COMPANY,
OHIO NATIONAL EQUITIES, INC.,

                                            Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(March 18, 2021)

Before WILSON, GRANT, and TJOFLAT, Circuit Judges.

PER CURIAM:

The issue presented by this appeal is whether Plaintiffs Trip Whatley, Susan Moore, and Tracy Lentz can bring claims against Ohio National and its affiliated companies (collectively, Ohio National) for failure to pay commissions under a contract to which the Plaintiffs are not parties. Plaintiffs brought claims for breach of contract as intended third-party beneficiaries, unjust enrichment, and tortious interference with business relations. The district court dismissed each claim with prejudice. After careful review, and with the benefit of oral argument, we affirm.

## I.

Ohio National is an insurance corporation that sells financial products. The financial product relevant to this case is a variable annuity with a guaranteed minimum income benefit rider (for simplicity, referred to as an Annuity). Ohio National issues these Annuities to broker dealers pursuant to Selling Agreements.[1] The broker dealers then enlist sales representatives—including Plaintiffs Whatley, Moore, and Lentz—to sell the Annuities. Plaintiffs have separate contracts with the broker dealers and are not parties to the Selling Agreements.

---

[1] Plaintiffs Whatley, Moore, and Lentz are registered representatives of broker dealers ProEquities, Inc., LPL Financial, and Securities America, respectively. Each of these broker dealers had a Selling Agreement with Ohio National. But because the Selling Agreements with each broker dealer—as well as the attached Commission Schedules—are substantively identical, we refer to them collectively.

Section 9 of the Selling Agreements between Ohio National and the broker dealers is entitled "Commissions Payable."  It provides:

> Commissions payable in connection with the contracts shall be paid to [the broker dealer] . . . according to the Commission Schedule(s) . . . .  Compensation to the [broker dealer's] Representatives . . . will be governed by agreement between [the broker dealer] and its Representatives and its payment will be the [broker dealer's] responsibility.

Section 9 further states that Ohio National's obligation to pay commissions pursuant to the Commission Schedule "shall survive this Agreement unless the Agreement is terminated for cause by [Ohio National]."  And the Commission Schedule provides, in part, that Ohio National is to pay the broker dealer "trail commissions" in return for selling and servicing Annuities.[2]

Plaintiffs allege that on September 28, 2018, Ohio National terminated the Selling Agreements with all broker dealers without cause and refused to pay the broker dealers trail commissions owed on existing Annuities.  The result, Plaintiffs allege, was that the broker dealers were unable to pass those trail commissions along to Plaintiffs pursuant to their separate agreements.[3]

---

[2] Trail commissions are commissions on previously sold Annuities that remain in force.  The Commission Schedule provides that "[t]rail commissions will continue to be paid to the broker dealer of record while the Selling Agreement remains in force and will be paid on a particular contract until the contract is surrendered or annuitized."

[3] The terms of the contracts between Plaintiffs and the broker dealers are not alleged in the First Amended Complaint.

On January 11, 2019, Plaintiffs filed this lawsuit against Ohio National, and on April 2, 2019, they filed a First Amended Complaint as a matter of course. The First Amended Complaint includes five causes of action, but only three are before us on appeal.[4] Plaintiffs' first claim is for breach of contract, based on the theory that they have standing as third-party beneficiaries of the Selling Agreements. Second, and in the alternative to the breach of contract claim, Plaintiffs allege unjust enrichment on the basis that it is unjust for Ohio National to benefit from retaining trail commissions that should have been paid pursuant to the Selling Agreements. Plaintiffs' third claim is for tortious interference with business relations. They claim that by failing to pay commissions, Ohio National interfered with the separate contracts between the broker dealers and Plaintiffs.

The district court granted Ohio National's motion to dismiss all claims. First, the court found that Plaintiffs' lacked standing to bring a breach of contract claim because they were not intended beneficiaries of the Selling Agreements. The district court relied heavily on Section 9 of the Selling Agreements which provides for direct payments from Ohio National to the *broker dealer*, while providing that Plaintiffs' compensation is the broker dealer's responsibility. Second, the court

---

[4] The First Amended Complaint includes claims for declaratory relief and promissory estoppel, but those claims are no longer raised on appeal. *See* Oral Argument Recording at 00:39–00:50 (Dec. 18, 2020).

held that Appellants could not bring an unjust enrichment claim based on an issue that was expressly governed by contract. Third, the court dismissed Plaintiffs' tortious interference claim, holding that under the "refusal to deal" doctrine, Ohio National could not be held liable in tort for terminating the Selling Agreements and stopping payment on trail commissions. Rather than granting Plaintiffs leave to amend, the district court dismissed each claim with prejudice. This appeal followed.

## II.

We review de novo a district court's grant of a motion to dismiss with prejudice. *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1066 (11th Cir. 2017). "We must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Id.*

## III.

## A.

We begin by addressing Plaintiffs' third-party beneficiary breach of contract claim. Under Ohio law, a third party has standing to sue for breach of contract only if they are an intended—rather than an incidental—beneficiary.[5] *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 638 N.E.2d 572, 577 (Ohio 1994). To

---

[5] This claim is governed by Ohio law because the Selling Agreements provide for Ohio choice of law.

be an intended beneficiary, a third party must show that the contracting parties intended to directly benefit the third party. *Huff v. FirstEnergy Corp.*, 957 N.E.2d 3, 7 (Ohio 2011). "Generally, the parties' intention to benefit a third party will be found in the language of the agreement." *Id.*

Plaintiffs argue that they are intended third-party beneficiaries under the plain language of the Selling Agreements. In support, they point out that the Selling Agreements refer to "Representatives" at least 25 times.

Ohio National responds by pointing us to two recent Sixth Circuit decisions. *Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850 (6th Cir. 2020); *Browning v. Ohio Nat'l Life Ins. Co.*, 819 F. App'x 306 (6th Cir. 2020). In these cases, sales representatives brought claims against Ohio National for breach of contract as third-party beneficiaries and for unjust enrichment. The claims were based on the same factual predicate alleged here.

In *Cook*, for example, the Sixth Circuit rejected the third-party beneficiary breach of contract claims.[6] 961 F.3d at 856. It explained that Section 9 of the Selling Agreements requires Ohio National to pay the broker dealer directly. *Id.* And although the Selling Agreements frequently reference sales representatives, Section 9 explicitly provides that the representatives' compensation remains the

---

[6] We cite to *Cook*—a published decision—although *Browning* applied the same reasoning and reached the same result. *Browning*, 819 F. App'x at 308 ("Our court's decision in *Cook* dictates the outcome of Browning's appeal.").

broker dealer's responsibility. Therefore, the Sixth Circuit found that the plain language of the Selling Agreements does not evince the parties' intent to directly benefit the sales representatives. *Id. Cook* is on point here, and, like the district court, we find its reasoning persuasive.

Yet Plaintiffs argue that Ohio law demands the opposite result. *See Visintine & Co. v. New York, Chi. & St. Louis R. Co.*, 160 N.E.2d 311 (Ohio 1959) (per curiam). In *Visintine*, the State of Ohio had a contract with several railroad companies and a separate agreement with a contractor to complete a single construction project. *Id.* at 312–14. The two contracts made the work of the railroad companies and the contractor mutually dependent. *Id.* at 314. When the railroad companies failed to perform their work, the contractor sued them for breach of contract. *Id.* at 313. Although there was no contract between the railroad companies and the contractor, the court concluded that the contractor could bring the action as a third-party beneficiary. *Id.* at 314. The companies had taken on a duty to perform obligations for the contractor (and vice versa) in the interest of completing the project as scheduled. Therefore, it was "apparent that [the companies' contract with the State] was intended to benefit the contractor." *Id.* (framing the core question as: "what was the performance contracted for and what is the best way to bring it about").

The district court found that *Visintine* does not apply here because its holding was limited to creditor beneficiaries. But even assuming *Visintine* is not so limited, the contractual language in that case established that the contractor and the railroad companies had assumed reciprocal obligations to one another. In contrast, Ohio National did not take on any duty vis-à-vis Plaintiffs. To the contrary, "the performance contracted for" in the Selling Agreements was that Ohio National would issue compensation only to the *broker dealer*, while the broker dealer would remain responsible for Plaintiffs' compensation. *Id.* Therefore, the Selling Agreements do not reflect an intent to benefit Plaintiffs.

It is true, of course, that "[w]e must accept the factual allegations in the complaint as true" at this stage. *Almanza*, 851 F.3d at 1066. But because the plain contractual language of the Selling Agreements demonstrates that the parties did not intend to benefit Plaintiffs, the third-party beneficiary claim fails as a matter of law.[7] Accordingly, we affirm the district court's grant of Ohio National's motion to dismiss Plaintiffs' breach of contract claim for lack of standing.

---

[7] Ohio National also argues that the relief Plaintiffs seek— enforcement of the Selling Agreements as third-party beneficiaries—would violate FINRA Rules, which prohibit direct payments to broker dealers' sales representatives. *See* FINRA Rule 2320(g)(1) (providing that "no associated person of a [FINRA] member shall accept any compensation from anyone other than the member with which the person is associated"). Because we conclude that the plain language of the Selling Agreements does not evince an intent to benefit Plaintiffs, we need not decide whether the relief Plaintiffs seek would trigger a violation of FINRA rules.

B.

We turn next to Plaintiffs' unjust enrichment claim. As with the breach of contract claim, Plaintiffs pled this claim under Ohio law. To recover for unjust enrichment under Ohio law, a plaintiff must prove three elements: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *See Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984) (per curiam). "Unjust enrichment is an equitable doctrine . . . that operates *in the absence of an express contract*." *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) (quoting *Beatley v. Beatley*, 828 N.E.2d 180, 192–93 (Ohio Ct. App. 2005)). "Thus, Ohio law is clear that a plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject." *Wuliger*, 567 F.3d at 799 (internal quotation mark omitted).

As a result, Plaintiffs cannot recover for unjust enrichment. *See Cook*, 961 F.3d 858–59. Again, *Cook* is on point and persuasive. The subject of Plaintiffs' claim is that Ohio National owes them commissions. But, as the Sixth Circuit explained, the Selling Agreements address that subject directly, stating that Ohio National is not responsible for the compensation of a broker dealer's sales representatives. *Id.* Therefore, the subject of Plaintiffs' claim is covered by an

9

express contract.  And as a result, Plaintiffs cannot recover under a theory of unjust enrichment.

## C.

Plaintiffs also appeal the dismissal of their tortious interference claim.[8]  This time relying on Alabama law, Plaintiffs allege that Ohio National's refusal to pay commissions had the effect of interfering with contracts between Plaintiffs and the broker dealers.

Under Alabama law, tortious interference with business relations requires: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage."  *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009).  Plaintiffs' theory is that Ohio National knew about the contracts between the broker dealers and their sales representatives, and that Ohio National's termination of the Selling Agreements interfered with those contracts by preventing the broker dealers from passing a portion of the trail commissions to Plaintiffs.

The district court found that, based on the Alabama Supreme Court's decision in *Barber v. Business Products Center, Inc.*, Plaintiffs' claim fails on the fourth element—intentional interference.  677 So. 2d 223 (Ala. 1996), *overruled*

---

[8] Tortious interference was not at issue in the Sixth Circuit's *Cook* decision.

10

*on other grounds by White Sands Group, L.L.C.*, 32 So. 3d at 14.[9]  *Barber* held that

a "mere refusal to deal" does not constitute tortious interference with business

relations.  *Id.* at 228.  In that case, the plaintiffs won a contract with the

government to repair typewriters.  *Id.* at 226.  The government had separate

contracts to buy typewriters from Panasonic and Canon.  *Id.*  These contracts

required Panasonic and Canon to make available parts and repair information to

local maintenance providers, such as the plaintiffs.  *Id.*  But when the plaintiffs

reached out to Panasonic's and Canon's local dealers to obtain needed repair parts,

the dealers refused to sell the parts, citing company policies to sell only to

authorized dealers.  *Id.*  As a result, the plaintiffs' ability to perform their

government contract was severely impaired.  The plaintiffs subsequently brought

claims against Panasonic and Canon, including for wanton misconduct and tortious

interference with business relations.  *Id.* at 225.

These two claims were dismissed at summary judgment, and the Alabama

Supreme Court affirmed.  On the wantonness claim, the court held that "a mere

failure to perform a contractual obligation is not a tort."  *Id.* at 228.  On the tortious

interference claim, it held that "a mere refusal to deal is not an intentional

---

[9] *White Sands* overruled *Barber* to the extent that it required evidence of fraud, force, or coercion as an element of the prima facie case for tortious interference with business relations.  32 So. 3d at 14.  The parties here seem to agree that *White Sands* did not overrule *Barber* to the extent it held that "a mere refusal to deal is not an intentional interference with contractual relations." *Barber*, 677 So. 2d at 228 (citing *Bear Creek Enters., Inc. v. Warrior & Gulf Navigation Co.,* 529 So. 2d 959 (Ala. 1988)).

interference with contractual relations." *Id.* (citing *Bear Creek Enters., Inc. v. Warrior & Gulf Navigation Co.*, 529 So. 2d 959 (Ala. 1988)). The court explained that "intentional interference" requires evidence of "active interference"—a mere breach of contract is not enough. *Id.* (holding that "defendants have the right to do business with whoever they choose and, although their refusal to deal may be actionable as a breach of contract, it is not actionable in tort").

*Barber* relied in part on an earlier Alabama refusal-to-deal case in which a contractor's decision to terminate a subcontractor did not amount to an "intentional interference" with the contract between the subcontractor and its employees. *See Bear Creek Enters.*, 529 So. 2d at 960–61. Importantly, the contractor in *Bear Creek* did not actively induce the subcontractor to break its contract with its employees—it merely refused to deal with the subcontractor going forward. *Id.* at 961. So, even though the contractor's refusal to deal disrupted the performance of the subcontractor-employee contract, it was not an intentional interference with business relations. *Id.*

As Plaintiffs point out, *Bear Creek* and *Barber* are different from this case in at least two ways. First, those cases were decided at summary judgment rather than at the pleading stage. Second, and more fundamentally, refusal-to-deal cases involve a defendant's decision not to transact business with another entity, or not to continue enlisting a particular subcontractor. *See id.* at 960–61; *Barber*, 677 So.

12

2d at 228.  The twist here is that Plaintiffs are not arguing that Ohio National must do business with broker dealers going forward—only that Ohio National must pay trail commissions owed on *existing* Annuities that survive the termination of the Selling Agreements.  Therefore, we agree with Plaintiffs that this case does not fall neatly within the refusal-to-deal line of cases.

But we disagree with Plaintiffs that Alabama case law clearly resolves this issue in their favor.  While Plaintiffs point us to *Alcazar Amusement Co. v. Mudd & Colley Amusement Co.*, 86 So. 209 (Ala. 1920), that case is inapposite.  The plaintiff in *Alcazar* sought to enjoin a third party from "enjoying the benefit" of "conscious[ly] aiding" a party in breaching an existing contract.  *Id.* at 211.  The language Plaintiffs cite from *Alcazar*—that a third party can be liable in tort "independent of a right of action against the other party to the contract"—does not speak to the core issue here: whether a third party's failure to perform its own contract amounts to "intentional interference" with another contract.  *Id.* at 212.

Without any binding precedent directly on point, we are left to make "our best *Erie* guess" as to the viability of Plaintiffs' claim under Alabama law.  *See Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 840 (11th Cir. 2020).  To that end, although *Barber* and *Bear Creek* are not quite on point, they do provide some guidance.  Despite those cases' different procedural postures, both appear to embrace a legal rule that *intentional* interference requires some type

13

of active interference on the defendant's part that goes beyond terminating or breaching its own contract.

And looking beyond Alabama case law, there is a line of cases directly on point that have concluded, with reasoning similar to *Barber* and *Bear Creek*, that a plaintiff cannot reframe a defendant's contract breach as tortious interference.[10] We find two cases cited by Ohio National to be particularly instructive.

First is *Wometco Theatres v. United Artists Corp.*, 186 S.E. 572 (Ga. Ct. App. 1935). As Ohio National notes, this case is especially relevant since Alabama courts have closely followed Georgia case law in defining tortious interference with business relations. *See Waddell & Reed, Inc. v. United Inv'rs Life Ins. Co.*, 875 So. 2d 1143, 1156 (Ala. 2003) ("declin[ing] to retreat from [its] earlier acceptance of precedent from Georgia," and "find[ing] cases applying Georgia law to be helpful"). In *Wometco*, a Georgia appellate court held that "the

---

[10] In this line of cases, courts have sometimes found that a tortious interference claim based on a defendant's breach of its own contract fails on the *intentional interference* element; others have found that the defendant did not act *improperly* or *without justification*; and still others have treated *intentional* and *improper* interference as a single element. *Compare Alvord & Swift v. Stewart M. Muller Const. Co.*, 385 N.E.2d 1238, 1241 (N.Y. 1978) (holding that because "the interference must be intentional, not merely negligent or incidental," a plaintiff does not state a claim by alleging that a defendant's breach of contract incidentally interfered with a third party's separate contract), *with R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 686 n.17 (7th Cir. 1987) (holding that a defendant's breach of contract that affects a third party's rights in a separate contract might be considered intentional interference but might not be considered "improper" if it "was purely incidental in character"). Alabama has not squarely addressed this issue. But its refusal-to-deal line of cases suggests that the "intentional interference" element requires some "active interference" beyond a mere contract breach that incidentally affects a third party's rights. *See Barber*, 677 So. 2d at 228. Therefore, it seems likely that Alabama courts would analyze this issue under the "intentional interference" element.

14

failure of a third person to perform an independent prior contract made with one of the parties does not give rise to a cause of action [in tort] for inducing the breach of the contract." *Id.* at 575. This is true, the court held, even if the breaching party knew that its breach would render the other contracting party unable to satisfy separate contractual duties to a third party. *Id.* at 574–75. Georgia courts have continued to cite this rule. *See Watkins v. Hereth*, 570 S.E.2d 629, 630 (Ga. Ct. App. 2002); *Kenimer v. Ward Wight Realty Co.*, 135 S.E.2d 501, 503 (Ga. Ct. App. 1964). In light of Alabama courts' consistent reliance on Georgia case law, we find *Wometco* and its progeny to be persuasive.

Second is *Artwear, Inc. v. Hughes*, a New York case in which a company, SNC, contracted with Andy Warhol's estate for the exclusive rights to Warhol's artwork and trademarks. 615 N.Y.S.2d 689, 690–91 (1994). Under this contract, Warhol's estate had the final right of approval, subject to a reasonableness requirement. *Id.* at 691. SNC then granted Artwear a sublicense to make T-shirts using Warhol's trademarks. *Id.* The sublicense agreement gave SNC and Warhol's estate the right of final approval, not subject to a reasonableness requirement. *Id.* When the relationship between Warhol's estate and SNC soured, none of Artwear's product was approved. *Id.* Artwear brought claims against the estate for, among other things, breach of contract as a third-party beneficiary and tortious interference with contractual rights. *Id.* at 691–92.

15

The New York state court found that Artwear was not an intended third-party beneficiary of SNC's license agreement with Warhol's estate. It then dismissed Artwear's tortious interference claim, holding that:

> Artwear's cause of action for tortious interference with contract is . . . by its own terms, based on the estate's alleged breach of the license agreement, which breach brought about SNC's failure to perform the sublicense agreement. In reality, this is nothing more than a claim for damages incidentally flowing from the breach of the license agreement, to which Artwear was not a party and of which it is not, for the reasons indicated, a third-party beneficiary . . . . There exists no tort liability to incidental beneficiaries not in privity . . . . Thus, Artwear . . . cannot transform an alleged breach of the license agreement by the estate, a party with which it is not in privity, into a tort claim against that party. Artwear's remedy is against the party with whom it dealt, SNC.

*Id.* at 695.

*Wometco* and *Artwear* are on point, and their reasoning meshes with that of the Alabama Supreme Court in *Barber*. The common thread running through the two lines of cases is that to satisfy the intentional interference element, the defendant must actively procure the breach of a separate contract; a mere failure to satisfy its own contractual obligation, which incidentally impacts the rights of a third party, does not suffice. *See Barber*, 677 So. 2d at 228 ("[A] mere refusal to deal is not an intentional interference with contractual relations[;] although [the] refusal to deal may be actionable as a breach of contract, it is not actionable in tort."); *Wometco Theatres,* 186 S.E. at 574–75 ("The mere failure of a party to a

16

contract to carry out its terms will not give rise to a [tort] cause of action . . . against it" even if the breaching party knows "that the opposite party will not be able to perform its contract with [a] third party.").

Connecting Alabama's refusal-to-deal cases with the *Wometco* and *Artwear* line of cases, "our best *Erie* guess" is that Alabama law does not allow plaintiffs who have failed to establish intended third-party beneficiary standing to transform the alleged contract breach into a tort claim. *See Thai Meditation*, 980 F.3d at 840. For this reason, we conclude that Ohio National's refusal to pay commissions owed under the Selling Agreements is not, as a matter of law, an intentional interference with the contracts between the broker dealers and their sales representatives. Accordingly, we affirm the district court's finding that Plaintiffs failed to state a claim for tortious interference with business relations.

## D.

Having concluded that the district court correctly dismissed each of Plaintiffs' claims, we must consider whether the district court correctly dismissed the claims with prejudice. Leave to amend is to be freely given when justice so requires. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (per curiam). "Generally, where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Id.* (alteration adopted and

17

internal quotation mark omitted). An amendment as a matter of course does not count as this "one chance to amend." *Id.* at 1163–64.

But there are exceptions to this rule. A district court need not grant leave to amend where amendment would be futile. *Id.* at 1163. To show that amendment would not be futile, a plaintiff must show how the complaint could be amended to cure its faults. *Almanza*, 851 F.3d at 1075.

Here, in Plaintiffs' memorandum in opposition to Ohio National's motion to dismiss, they included a footnote asking for leave to amend should the district court find their claims deficient. But Plaintiffs did not indicate to the district court the substance of a proposed amended complaint—nor do their briefs indicate how their complaint could be amended to cure its faults. *Id.* As a result, we cannot say that the district court abused its discretion in dismissing Plaintiffs' First Amended Complaint with prejudice.

**AFFIRMED.**