"WILSON, Circuit Judge:
Automobile body shops filed five complaints, each asserting federal antitrust and state tort claims against insurance companies. The body shops appeal the dismissal of their complaints for failure to state a claim.
The automobile insurance and repair industries have customs and practices that the public frequently encounter and endorse. The public’s level of familiarity, however, has no bearing on whether such customs and practices have been employed for the benefit of a long-term scheme designed to thwart antitrust and tort laws. Wary of the prejudicial effect of preconceptions about these industries, assuming as true only those facts within the four corners of the complaints, and drawing inferences from those facts only in favor of the body shops, we determine that the shops pleaded enough facts to plausibly support their federal antitrust and state tort claims. We reverse the dismissal of those claims.
I. Introduction
In their complaints, the body shops argue that the insurance companies engaged in two lines of tactics in pursuit of a single goal: to depress the shops’ rates for automobile repair. The first line of tactics was designed to set a “market rate,” which reflected not the forces of the market but an artificial rate that would benefit only the insurance companies. The second line of tactics was designed to pressure the body shops into accepting the market rate by steering insureds away from the non-compliant shops that charged more than the rate. The body shops argue that the insurance companies’ concurrent lines of tactics violated both federal antitrust and state tort laws.
The body shops argue two types of antitrust violations. First, the body shops argue that the insurance companies engaged in horizontal price fixing, an illegal agreement among competitors to fix prices. Instead of pleading facts that directly support the existence of an agreement, the body shops plead facts supporting circumstances—such as parallel conduct, adoption of a uniform price despite variables that would ordinarily result in divergent prices, and uniform practices—from which the shops infer the existence of an agreement. Second, the body shops argue that the insurance companies boycotted the non-compliant shops that charged more than the fixed prices by enlisting unwitting insureds into their scheme. Specifically, the body shops argue that the insurance companies steered insureds away from the non-compliant shops with misleading or false statements about the shops’ business integrity and quality.
Arguing the commission of three state torts, the body shops assert that the insurance companies were unjustly enriched, deprived the shops of quantum meruit, and tortiously interfered with potential business of the shops.
Because the body shops plead enough facts to plausibly support then- federal antitrust and state tort claims, we reverse the dismissal of those claims.
*1268 II. Factual Allegations[1]
A. The insurance companies generate a significant portion of the body shops’ revenues.
The body shops operate in Kentucky, Missouri, New Jersey, and Virginia. The insurance companies offer' policies in these states and collectively control approximately 65% of the private passenger automobile insurance market in Kentucky, 85% in Missouri, 72% in New Jersey, and 100% in Virginia. Of the insurance companies, the State Farm companies have the largest market share: they control approximately 22.3% of the private passenger automobile insurance market in Kentucky, 22.88% in Missouri, and 14.85% in Virginia.[2] The insurance companies’ insureds generate 60% of the Kentucky body shop’s revenue and between 70% and '95% of the revenue of each of the remaining body shops. Most of the insurance companies are subsidiaries or affiliates, or are otherwise related.
B, First line of tactics: The insurance companies select the “market rate” at which they reimburse the body shops.
The insurance companies refuse to reimburse the body shops at more than the “market rate,” which, is a term that appears in direct repair program (DRP) agreements between the companies and certain body shops. Under a DRP agreement, an insurance company lists a body shop as a “preferred provider” in exchange for the company’s paying the shop no more than the “going rate in the market area.” However, even if a body shop does not participate in an insurance company’s DRP, the company refuses to reimburse the shop at more than the market rate. None of the plaintiff body shops participates' in a defendant insurance company’s DRP.[3]
The market rate comprises the market labor rate and the market materials costs, both of which the insurance companies select. The insurance companies use the market labor rate that one company, State Farm, determines by using a method that is unverified and the results of which State Farm manipulates. Also, the insurance companies depress the market material costs by pressuring body shops into using inferior parts and into offering discounts and concessions.

1, The insurance companies use the market labor rate that one company determines and manipulates.

In determining the market labor rate that all of the insurance companies use, State Farm uses an unverified “half plus one” method of calculation and manipulates the result.[4] The half plus one method (1) calculates half plus one—an amount we *1269 designate as “n”—of the total number of employees or work bays (whichever is fewer in each body shop) in the market area; (2) lists the shops in a market area from the shop with the fewest employees or work bays to, the shop with the most; and (3) declares the market labor rate as the labor rate of the shop that employs the nth employee or work bay. It is unclear how the method designates a market area. No insurance company other than -State Farm has attempted to independently verify the results of this method. . .
In addition to using an unverified method of calculating the market labor rate, State Farm manipulates the results of the method by affecting the inputs. First, State Farm affects the labor rate that a body shop submits through an online survey compiling information used in the half plus one method. A body shop that enters a DRP agreement with State Farm can fill out a survey about the shop’s labor rate through an electronic forum, State Farm’s Business to Business portal. State Farm can and does manipulate a body' shop’s survey submission. Second, State Farm affects the inputs used in the half plus one method by removing a body shop that charges a higher labor rate from the DRP. If a DRP body shop tries to charge more than the market labor rate, State Farm first tells the shop that it is the only shop that is- attempting to raise its labor rate— when in fact several shops have done the same. If the DRP body shop continues to charge a higher labor rate, State Farm threatens to and does remove the shop from the DRP. Thus the labor rate of the body shop no longer contributes, even facially, to the calculation of' the market labor rate.
By using an unverified method of calculating the market labor rate and by manipulating the results, State Farm achieves a wholly artificial market labor rate.

2. The insurance companies lower the market materials costs by pressuring the body shops into using inferi- or parts and into offering discounts and concessions.

The insurance companies depress the market material costs. They use tactics such as requiring a body shop to repair a faulty part rather than installing a replacement part, even when the shop strongly recommends against continued use of the faulty part; requiring a shop to install a used or recycled part, even when a new part is available and would be best; and requiring a shop to offer discounts and concessions, even if doing so will force the shop to operate at a loss.

3. The resulting market rate is' arbitrary and inconsistent with leading collision repair estimating databases.

The resulting market rate is arbitrary and inconsistent with three leading collision repair estimating databases, ADP, CCC, and Mitchell, on which the insurance companies selectively rely, For example, insurance companies strictly adhere to the labor time estimated by a database, yet they argue that materials costs are included in a repair estimate (the amount that-the companies would have to pay) although the databases state that the costs are not included in an estimate. The Kentucky and Missouri complaints include allegations about an employee of Safeco Insurance Company who stated that “the corporate direction given was” for the employee to pay a body shop in accordance with the databases only “when it was financially advantageous to the insurer to do so.” This practice of creating arbitrary rates forces a body shop either to perform an incomplete or substandard repair—which prevents the shop from -fulfilling an obligation to a customer to return a vehicle to its pre- *1270 accident condition—or to accumulate costs without compensation—which jeopardizes the shop’s business.[5]
C. Second line of tactics: The insurance companies force compliance with their artificial market rate.
The insurance companies force the body shops to charge at or less than the market rate with misleading or false statements to insureds about a non-compliant shop’s business integrity and quality. For example, the insurance companies tell an insured that the body shop takes longer to repair (and that the company would not pay for a rental car after a certain number of days); that the company cannot guarantee the shop’s work as it does for other shops; that the shop offers lower quality services; and that previous customers had complained about the shop. The statement that a body shop takes longer is misleading because any delay by a shop is caused by an insurance company’s delay in sending an appraiser to inspect an insured’s vehicle.[6] Also, the statement that an insurance company cannot guarantee the body shop’s work is misleading because the company does not guarantee the work of any shop. Finally, the insurance companies make the remaining statements without ascertaining the truth of the statements and with the intent to.disparage a non-compliant body shop’s business integrity and quality.
III. Procedural History
Initially, the body shops sued in the states in which they are located. Because the actions involved similar antitrust and tort claims, the Judicial Panel on Multidis-trict Litigation transferred the actions to the Middle District of Florida for consolidated pretrial proceedings. This appeal is by body shops in five of fourteen actions that were dismissed. Although the district court granted the body shops an opportunity to amend them complaints, the shops in the five actions chose to appeal instead.[7]
IV. Standard of Review
We review de novo a dismissal for failure to state a claim. Spanish Broad. Sys., 376 F.3d at 1070. We must reverse the dismissal if the complaint “state[s] a claim to relief that is plausible on its face,” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)), after we accept the factual allegations as true and draw all reasonable inferences in favor of the claimant, see Spanish Broad. Sys., 376 F.3d at 1070.
An antitrust complaint must include allegations “plausibly suggesting (not merely consistent with)” an illegal agreement among the defendants. Jacobs v. Tempur-Pedic Int’l, Inc., 626 F.3d 1327, 1332 (11th Cir. 2010) (citing Twombly, 550 *1271 U.S. at 557, 127 S.Ct. at 1966). This requirement “reflects”—and does not exceed—“the threshold requirement of Rule 8(a)(2) [of the Federal Rules of Civil Procedure] that the [complaint’s] plain statement [of a claim] possess enough heft to show that the pleader is entitled to relief.” Twombly, 550 U.S. at 557, 127 S.Ct. at 1966 (internal quotation marks omitted); see also id. at 570, 127 S.Ct. at 1974 (clarifying that an antitrust claim is not subject to a “heightened” pleading standard).
Y. Federal Antitrust Claims A. Horizontal Price Fixing

1. A price fixing agreement can be inferred in the absence of direct evidence of an agreement.

Under 15 U.S.C. § 1 of the Sherman Antitrust Act, any unreasonable contract, combination, or conspiracy in the restraint of interstate trade or commerce is illegal. See Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988) (interpreting § 1 “to prohibit only unreasonable restraints of trade”). Generally, a plaintiff must demonstrate that such a contract, combination, or conspiracy is “unreasonable and anticompetitive”; in other words, we ordinarily apply the “rule of reason.” See Texaco Inc. v. Dagher, 547 U.S. 1, 5, 126 S.Ct. 1276, 1279, 164 L.Ed.2d 1 (2006). Certain classes of conduct, however, are deemed “per se” violations, which are “conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.” See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985).
An example of a per se violation is horizontal price fixing, Jacobs, 626 F.3d at 1334, which must involve an agreement among competitors, “tacit or express,” see Twombly, 550 U.S. at 553, 127 S.Ct. at 1964 (internal quotation marks omitted). If the existence of the agreement is in doubt, the agreement can be inferred. See id. Necessary for this inference is “parallel conduct or interdependence,” ideas that are often used interchangeably. See id. at 554, 127 S.Ct. at 1964; Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1411 (3d ed. 2012). An example of parallel conduct is “conscious parallelism,” which is:
the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.
Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S.Ct. 2578, 2590, 125 L.Ed.2d 168 (1993); see also Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1291 (11th Cir. 2003). Interdependence, also known as “interdependent parallelism,” “means that the profitability of [a company’s] decision depends upon rivals’ reactions.” Areeda ¶¶ 1434a, 1434c.
However, a party claiming horizontal price fixing based on an inferred agreement must show more than parallel conduct, which on its own “falls short of conclusively establishing agreement or ... constituting a Sherman Act offense.” Twombly, 550 U.S. at 553, 127 S.Ct. at 1964 (internal quotation marks omitted); see also id. at 554, 127 S.Ct. at 1964 (finding that parallel conduct appears in “a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market”). Thus, in the absence of direct evidence of an agreement, an antitrust claimant must show not only “parallel conduct” but also *1272 “further factual enhancement.” Id. at 557, 127 S.Ct. at 1966; see also Almanza v. United Airlines, Inc., 851 F.3d 1060, 1069 (11th Cir. 2017).
Often labeled “parallel plus” or “plus factors,” see, e.g., Twombly, 550 U.S. at 553, 127 S.Ct. at 1963 (discussing the practice in the Second Circuit); Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 45 (1st Cir. 2013), these factual enhancements “serve as proxies for direct evidence of an agreement,” In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 (3d Cir. 2004). This circuit has never prescribed factors or a combination of factors that may be sufficient to tip parallel conduct into the domain of per se violation. Compare Williamson Oil, 346 F.3d at 1301, with In re Travel Agent Comm’n Antitrust Litig., 583 F.3d 896, 907 (6th Cir. 2009) (prescribing which “‘plus factors’ [a]re important when evaluating circumstantial evidence of concerted action”). Instead, this circuit has determined that “any showing by [a plaintiff] that tends to exclude the possibility of independent action can qualify as a plus factor.” Williamson Oil, 346 F.3d at 1301 (internal quotation marks omitted); see also Almanza, 851 F.3d at 1069 (reproducing and refuting the plaintiffs’ list of “further factual enhancement[s] needed to support a plausible inference of an agreement”).
Because we do not prescribe plus factors, we do not assign a predetermined weight to a factor; we decide a factor’s importance only after reviewing it in the context of the facts of the case and determining its tendency “to exclude the possibility of independent action.” See Williamson Oil, 346 F.3d at 1301 (internal quotation marks omitted); In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1189 (9th Cir. 2015) (“But plaintiffs’ plus factors are no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an interdependent market.”). In the same vein, we do not prescribe how many plus factors[1] would be necessary to establish an illegal agreement; the number of factors present has no bearing on whether an antitrust claimant has established an illegal agreement.

2. The body shops’ allegations readily and plausibly establish an inferred agreement.

The body shops’ allegations, accepted as true, readily and plausibly establish both parallel conduct and the “further factual enhancement needed to support a plausible inference of an agreement.” See Almanza, 851 F.3d at 1069. The body shops plausibly establish parallel conduct; they allege that the insurance companies adopted the same labor rate and materials ■ costs and employed the same line of tactics to depress the rate and costs. See Williamson Oil, 346 F.3d at 1304 (“As evidenced by the repeated, synchronous pricing decisions that occurred within the tobacco industry between 1993 and 2000, appellees plainly priced their products in parallel.”).
Also, the body shops plausibly establish further factual enhancement. The body shops identify two plus factors that together support a plausible inference of an illegal agreement:
[1] Conduct that probably does not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties[; and] ...
[2] whether the defendants have been uniform in their actions[.]
The first is a well-recognized plus factor—the presence of “[c]ustomary indications of traditional conspiracy”—and supports an inference of an illegal agree *1273 ment here. See Areeda ¶ 1434b; id. ¶ 1434b n.20 (listing “unnatural parallelism” as an example of a customary indication of traditional conspiracy); id. ¶ 1425 (defining unnatural parallelism as “parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties”); Twombly, 550 U.S. at 556 n.4, 127 S.Ct. at 1965 n.4 (citing the Areeda treatise for the proposition that unnatural parallelism is an illegal agreement). One customary indication of traditional conspiracy is a group’s adoption’of a uniform price despite variables that would ordinarily result in divergent prices. See, e.g., Fed. Trade Comm’n v. Cement Inst., 333 U.S. 683, 713, 68 S.Ct. 793, 809, 92 L.Ed. 1010 (1948) (“The use of the multiple basing point delivered price system by the cement producers has been coincident with a situation whereby for many years, with rare exceptions, cement has been offered for sale in every given locality at identical prices and terms by all producers.”); Areeda ¶ 1434b (stating that customary indications of traditional conspiracy are present if rivals place “simultaneous identical bids on a made-to-order product not readily assembled from standard and conventionally priced items”).
According to the body shops, the insurance companies “specifically advised the [shops] they will pay no more than State Farm pays” despite variables that would ordinarily contribute to divergent amounts of reimbursement. For example, the insurance companies utilized State Farm’s market rate although the rate necessarily depends on how each company defines a market. This definition can depend on factors such as the geographic area that an insurance company offers services, the locations that the company has physical offices, and the company’s relationship with the body shops in certain areas. Also, the insurance companies utilized State Farm’s market rate although the companies have the ability to differentiate themselves by offering reimbursement for repairs using high quality part's (e.g., only “replacement parts” from original manufacturers rather than repaired faulty parts from insureds’ cars and “used or recycled parts” from other cars) and highly skilled labor.'Finally, the insurance companies utilized State Farm’s market rate although the companies conduct business with different body shops, which would charge different labor prices. A customary indication of traditional conspiracy is present here and contributes to a plausible inference of an illegal agreement.
The second plus factor—uniform practices—also favors finding an illegal agreement. The body shops allege that the insurance companies all engaged in the first line of tactics, which included requiring a shop to repair a faulty part rather than install a replacement part; to install a used or recycled part; and to offer discounts and concessions, even to thé detriment of the shops offering such discounts and concessions. Also, the body shops allege that the insurance companies all engaged in the second line of tactics. Although this'line'of tactics primarily aims to force the' body shops into compliance with the market rate, the tactics aid also in creating an artificial market rate. The tactics include stating to an insured that a body shop takes longer to repair (and that the insurance company would not pay for a rental car after a certain number of days); that the company cannot guarantee the shop’s work as it does for other shops; that the shop offers lower quality services; and that previous customers had complained about the shop. Each statement is either misleading or false. Each insurance company’s use of this same collection of tactics contributes to a plausible inference of an illegal agreement.
*1274 The body shops’ allegations readily and plausibly establish the existence of parallel conduct, adoption of a uniform price despite variables that would ordinarily result in divergent prices, and uniform practices, all from which we can infer the existence of an illegal agreement. See Twombly, 550 U.S. at 572, 127 S.Ct. at 1975. We reverse the dismissal of the price fixing claims.

3. The arguments against the plausible inference of an illegal agreement fail.

Dismissing the price fixing claims, the district court states—and the insurance companies recite on appeal—that, “aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when.” However, allegations directly supporting the existence of an agreement, such as form (written or oral) and date of entry, are unnecessary for a plausible claim of horizontal price fixing. In the absence of direct evidence of an agreement, the allegations necessary are those that plausibly establish parallel conduct and further factual enhancement. “Asking for plausible grounds to infer an agreement ... simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.” Twombly, 550 U.S. at 556, 127 S.Ct. at 1965 (emphasis added).[8]
The insurance companies argue that the body shops fail to allege an agreement to fix a price because the “market rate” is a mere “ceiling” on what the companies are willing to pay. However, whether the market rate in fact functions as a ceiling or as the rate at which the insurance companies reimburse the body shops is inapposite. “[AJgreements to fix maximum prices” are likewise per se violations that “cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.” See State Oil Co. v. Khan, 522 U.S. 3, 11, 118 S.Ct. 275, 280, 139 L.Ed.2d 199 (1997) (internal quotation marks omitted).
Also, the insurance companies argue that the body shops’ plus factors are not properly before us because the shops argued their existence for the first time on appeal. Although the body shops have not used the phrase “plus factors,” the shops have consistently argued that their allegations support the inference of an illegal agreement. And use of the phrase “plus factors” is not necessary for the use of these factors on appeal. As we have explained, “any showing by appellants that tends to exclude the possibility of independent action can qualify as a plus factor.” Williamson Oil, 346 F.3d at 1301 (internal quotation marks omitted). Even this circuit’s precedent has not always used the phrase to characterize “further factual enhancement needed to support a plausible inference of an agreement.” See Almanza, 851 F.3d at 1069; Jacobs, 626 F.3d at 1343. The body shops’ recent use of the phrase “plus factors” does not change the fact that they have consistently argued that the allegations support the inference of an illegal agreement.
The Dissent, although agreeing with the existence of parallel conduct, argues that the proposed plus factors fail to “bear the weight attributed to them.” Dissent at 1282. Challenging the first plus factor—the insurance companies’ adoption of a uniform price despite variables that would ordinarily result in divergent prices—the Dissent disputes that “auto body repairs” are “the type of made-to-order product not readily *1275 assembled from standard and conventionally priced items.” Dissent at 1284. In support, the Dissent substitutes allegations in the complaint with an external knowledge of auto repair:
Certainly, some parts—such as spark plugs, windshield wipers, brakes, and tires—may be standard across many makes and models of cars, while others—such as doors, windshields, headlights, and fenders—may only fit a few. But for the overwhelming majority of cars, the necessary parts are ubiquitous, interchangeable, and standardly priced.
See Dissent at 1284. Although Iqbal instructs us to “draw on [our] judicial experience and common sense,” Iqbal, 556 U.S. at 679, 129 S.Ct. at 1950, what automobile parts are necessary for repairs and whether those parts are “ubiquitous, interchangeable, and standardly priced” are hardly “judicial experience” or “common sense.” The Dissent’s substitution based on external knowledge belies the “the tenet that a court must accept as true all of the allegations contained in a complaint.” Id. at 678, 129 S.Ct. at 1949. And the substitution is not an inference in favor of the claimants, the body shops. See Spanish Broad. Sys., 376 F.3d at 1070. Rather, it is the opposite. Review of the body shops’ allegations does indeed reveal variables that would ordinarily result in divergent prices: the shops allege that they use parts from different sources (e.g., “replacement parts” from original manufacturers, repaired faulty parts from insureds’ cars, and “used or recycled parts” from other cars) and charge different prices for the labor required to install the parts.
Also, challenging the first factor, the Dissent compares the allegations of this case to the facts in Cement Institute, which involved sealed bids to supply cement for the same price per barrel. See 333 U.S. at 713, 68 S.Ct. 793. The Dissent compares first the secrecy of the bids in Cement Institute with the brazenness of the insurance companies’ declaration that “they will pay no more than State Farm pays.” See Dissent at 1280. However, secrecy is not necessary for the first plus factor—adoption of a uniform price despite variables that would ordinarily result in divergent prices—“to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.” Twombly, 550 U.S. at 556, 127 S.Ct. at 1965. Also, the Dissent compares the fact that the cement companies in Cement Institute agreed upon a specific price ($3.286854 per barrel) with the fact that the insurance companies here declared that “they will pay no more than State Farm pays.” See Dissent at 1280. But the per se violation of horizontal price fixing includes an agreement “formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing” prices. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940) (emphasis added).
Challenging the second plus factor, the Dissent argues that the body shops’ tactics are “among the most common and timeworn methods of increasing corporate profits in any industry.” Dissent at 1285. This argument, however, relies on the Dissent’s external knowledge about practices commonplace in the automobile industry and consequent derogation of the severity of the tactics alleged in the complaint. Again, we must look only within the four corners of the complaint. The complaints contain extensive allegations about the concerning practices of insurance companies that make the same misleading or false statements about certain body shops to ensure that the amount that the companies must reimburse the shops stays low. They contain the practices of insurance companies that all force body shops to install parts that the shops believe are *1276 unsafe and force shops to offer discounts and concessions at the risk of losing'between 70% and 95% of their revenue (60% for the Kentucky body shop). The Dissent’s external knowledge about these practices is inapposite to whether these practices violate federal antitrust law. The Dissent’s'external knowledge is inapposite to this review of the sufficiency of the complaints.[9]
B. Boycotting
The Sherman Act’s prohibition of any unreasonable contract, combination, or conspiracy in the restraint of interstate trade or commerce extends to a prohibition of boycotting. See 15 U.S.C. §§ 1, 1013(b); St. Paul Fire & Marine Ins. v. Barry, 438 U.S. 531, 541, 98 S.Ct. 2923, 2929, 57 L.Ed.2d 932 (1978). “The generic concept of boycott refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target.” St. Paul Fire & Marine Ins., 438 U.S. at 541, 98 S.Ct. at 2930. Boycotting that is per se illegal involves “horizontal agreements among direct competitors.” See NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998). The “ultimate target” of the agreement can be either a competitor or “a customer of some or all of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters].” St. Paul Fire & Marine Ins., 438 U.S. at 543, 98 S.Ct. at 2931.
Accepted as true, the body shops’ allegations readily and plausibly establish the per se violation of boycotting. The body shops allege that the insurance companies targeted non-compliant shops by keeping insureds away until those Shops charged at or less than the market rate. And the body shops allege that, in accordance with the agreement, the insurance companies used identical tactics to keep insureds away. Specifically, they allege that the insurance companies made mis-leáding or false statements about the body shops’ busihess integrity and quality, including that a shop takes longer to repair (and that the company would not pay for a rental car after a certain number of days); that the company cannot guarantee the shop’s work as it does for other shops; that the shop offers lower quality services; and that previous customers had complained about the shop. We revérse the dismissal of the boycotting claims.
Challenging this reversal, the Dissent argues that, because the insurance companies can choose from an ambit of different (and commonplace) tactics, the tactics are not uniform. In.support, the Dissent draws an analogy to people choosing from different but limited modes of transportation (car, bike, train, etc.) to reach the same destination. This analogy again belies allegations in the complaint that each tactic was misleading or false. As compared to the common and limited, means of transportation, the insurance, companies’ misleading or false tactics together create an idiosyncrasy, the repetition of which is hardly “common.” The insurance compa *1277 nies' use of the same ambit of tactics “raise[s] a reasonable expectation that discovery will reveal evidence of illegal agreement.” Twombly, 550 U.S. at 556, 127 S.Ct. at 1965.
VI. State Tort Claims
In addition to claiming antitrust violations, the body shops claim that the insurance companies committed state torts, three of which are on appeal: unjust enrichment, quantum meruit, and tortious interference. Because the body shops’ allegations plausibly support each claim, we reverse the dismissal of the claims.
A. Unjust Enrichment
Generally, unjust enrichment requires a showing that a plaintiff conferred a benefit on a defendant that the defendant knew about and that allowing the defendant to retain the benefit without payment would be unjust. See Jones v. Sparks, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009); JB Contracting, Inc. v. Bierman, 147 S.W.3d 814, 819 (Mo. Ct. App. 2004); Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110, 922 A.2d 710 (2007); Schmidt v. Household Fin. Corp., II, 276 Va. 108, 116, 661 S.E.2d 834 (2008). The allegations readily and plausibly establish the claims of unjust enrichment. The body shops allege that the shops conferred benefits by providing repair services at the low price that the insurance companies collectively selected. Also, the body shops allege that the insurance companies not only knew about the benefits but also forced the shops to,confer the benefits with two lines of tactics: first selecting a low market rate and second pressuring the shops into accepting the market rate. If we assume the truth of these allegations, the body shops have stated claims for unjust enrichment. We reverse the dismissal of the unjust enrichment claims.
Both the district court and the Dissent reject the claims for unjust enrichment based on the argument that, because the body shops knew how much they were going to be paid before repairing cars, these claims for unjust enrichment are based on buyer’s remorse—based on unsatisfactory bargaining by the shops—and that the claims are for post hoc judicial determination of a reasonable rate for the repairs. This argument is based on a mistaken assumption that any dealing between the body shops-and' the insurance companies was based on a valid contract. See Dissent at 1291 (“They were not threatened or tricked. They were not coerced.”). Assuming the truth of the allegations and drawing inferences in favor of the body shops, the insurance companies forced the shops to perform repairs, and any dealing between the shops and the companies was based on an invalid, unenforceable contract. “[A] liability in respect of benefits already received [should not] be imposed (or measured) by the terms of an invalid contract.” Restatement (Third) of Restitution and Unjust Enrichment § 33 cmt. d (2011); see also id. (“Liability in contract [is] distinguished from liability in restitution.” (emphasis omitted)).
The district court dismissed the body shops’ claims for unjust enrichment by faulting the shops for failing to bargain with the insurance companies. In imposing this requirement to bargain, the court cited a comment in the Third Restatement of Restitution, and Unjust Enrichment entitled “jBenefits voluntarily conferred”: “Instead of proposing a bargain, the restitution claimant first confers a benefit, then seeks payment for its value. When this manner of proceeding is unacceptable—as it usually is, if the claimant neglects an opportunity to contract—a claim based on unjust enrichment will be denied.” Id. § 2 cmt. d. However, the body shops consistently allege that the insurance companies forced the shops to confer benefits; that *1278 the shops involuntarily -performed repairs at the low market rate.
Disputing the resolution of the unjust enrichment claims, the Dissent warns of a world in which parties can renege on the terms of a contract by suing for unjust enrichment. The Dissent offers an example of a painter who could contract to paint a home for $10,000 and then recover $5,000 based on an argument that the actual market rate was $15,000. The Dissent offers a second example of a circumstance in which the result is the same despite less parity in bargaining power. These analogies, designed to demonstrate an absurd result, derive from the Dissent’s assumption that the body shops’ claims are based on unsatisfactory bargaining by the shops. However, the allegations, assumed as true, establish that no bargaining occurred that could support the existence of an enforceable agreement. Also, our ruling has no bearing on whether the body shops will later successfully prove the invalidity of the contracts under which they repaired the vehicles of the defendant companies’ insureds. Even if the parties did bargain and the issue becomes whether the disparity in bargaining power was such that would invalidate the contract, determining the extent of disparity compels, at the very least, discovery. The Dissent’s hypothetical remains just that—a hypothetical.
B. Quantum Meruit
Generally, quantum meruit requires a showing that a plaintiff with a reasonable expectation of compensation rendered valuable services to a defendant who knew about the services but refused to pay reasonable value for the services. See Quadrille Bus. Sys. v. Ky. Cattlemen’s Ass’n, Inc., 242 S.W.3d 359, 366 (Ky. Ct. App. 2007); Starkey, Kelly, Blaney & White v. Estate of Nicolaysen, 172 N.J. 60, 68, 796 A.2d 238 (2002); Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp., 961 F.2d 489, 491 (4th Cir. 1992) (applying Virginia law).[10] The allegations readily and plausibly establish the claims for quantum meruit. The body shops allege that they rendered repair services, expecting compensation; that the services were in fact for the insurance companies, which were obligated to pay the shops in accordance with the companies’ relationship with their insureds; and that the companies paid an artificial price, below the reasonable value for the services. Also, the body shops allege that the insurance companies demanded discounts and concessions for the companies’ insureds; such additional services were provided to the companies, who refused to pay any compensation for those services. If we assume the truth of these allegations, the body shops have stated claims for quantum me-ruit. We reverse the dismissal of the claims.
C. Tortious Interference
Generally, tortious interference requires a showing of a valid business relationship or expectancy that would have occurred but for the defendant’s improper or malicious interference, which resulted in damages. See Snow Pallet, Inc. v. Monticello Banking Co., 367 S.W.3d 1, 6 (Ky. Ct. App. 2012); Clinch v. Heartland Health, 187 S.W.3d 10, 14 (Mo. Ct. App. 2006); Lamorte Burns & Co. v. Walters, 167 N.J. 285, 305-06, 770 A.2d 1158 (2001); Dunlap v. Cottman Transmission Sys., LLC, 287 Va. 207, 216, 754 S.E.2d 313 (2014). The allegations readily and plausibly establish the claims of tortious interference. The body shops allege (1) that the insurance companies prevented insureds willing to use the shops from doing so with misleading or false statements about the shops’ business integrity and quality and (2) that *1279 this prevention resulted in the loss of business. Also, the body shops allege that the insurance companies forced the shops to perform incomplete or substandard repairs, which prevented the shops from fulfilling obligations to customers to return vehicles to their pre-accident conditions and which negatively affected business. If we assume the truth of these allegations, the body shops have stated claims for tor-tious interference.
In dismissing the body shops’ claims for tortious interference, the district court faulted the shops for filing a so-called “group pleading,” which prevented the shops from tailoring their allegations to the claim of tortious interference in each state. Although the complaints are largely similar, the complaints as they stand include sufficiently tailored allegations for us to conclude the plausibility of the claim of tortious interference in each state. For example, the complaints specify for each state the insurance companies that used State Farm’s market rate, the market dominance of the defendant companies, and the percentage of revenue that the defendant companies generated for a body shop—all of which establish the companies’ command over a shop in each state. These individualized allegations lend credence to the claims that the insurance companies exercised enough control over insureds’ choice of body shops to affect the profitability of the shops.
Also, in dismissing the tortious interference claims, the district court stated that, “at a minimum, Plaintiffs should allege sufficient facts specific to each Defendant, or at least each corporate family of Defendants, to tie that Defendant to the wrongdoing alleged.” It is unclear why such allegations are necessary; in a complaint alleging uniformity of the insurance companies’ price and practices, requiring the body shops to include allegations about each company can only result in needless repetition. Further, the complaints specified two insurance companies as engaging in tortious interference: State Farm, for its role in determining the market labor rate, and GEICO, for its delay in payment and re-inspection.[11] We reverse the dismissal of the tortious interference claims.
VII. Conclusion
At no point did the body shops claim to know when, where, and how the insurance companies agreed to fix a market rate and to boycott those who charged more—nor did the shops have to. “Asking for plausible grounds to infer an agreement ... simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.” Twombly, 550 U.S. at 556, 127 S.Ct. at 1965. The body shops have supplied enough allegations to raise such a reasonable expectation. The body shops have consistently alleged the existence of parallel conduct and of plus factors allowing a plausible inference of an illegal agreement. And the allegations have sufficiently established the body shops’ state tort claims of unjust enrichment, quantum meruit, and tortious interference. We reverse and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED.

. Reviewing a dismissal for failure to state a claim, we accept the factual allegations as true and draw all reasonable inferences in favor of the claimant. Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1070 (11th Cir. 2004). The facts as pleaded in the complaints, and viewed in the light most favorable to the plaintiffs, are as follows.

. The New Jersey complaints do not allege State Farm’s control of that state's private passenger automobile insurance market.

. The Missouri body shop participated in State Farm’s DRP for ten years; State Farm eliminated the shop from the program in 2013 after the shop refused to implement the company’s parts procurement program.

. In addition to using the market labor rate, the other insurance companies have specifically advised the body shops that the companies “will pay no more than State Farm pays for labor.”

. The body shops attached as an exhibit to each complaint a "non-exhaustive list of procedures and processes the [djefendants refuse to pay and/or pay in full.”

. The New Jersey body shops allege that the GEICO companies in particular delay supplemental payments and delay re-inspecting vehicles. After finally inspecting a vehicle, a GEICO inspector would refuse to pay a body shop because the bill is "too old.” If the insured also refuses to pay the bill, the body shop must absorb the unpaid cost.

."Generally, an order dismissing a complaint is not final and appealable unless the order holds that it dismisses the entire action or that the complaint cannot be saved by amendment. ... However, [in this circuit] the plaintiff need not wait until the time for amendment expires; he can waive the right to later amend, treat the dismissal as final, and file a notice of appeal before the expiration of the amendment period.” Van Poyck v. Singletary, 11 F.3d 146, 148 (11th Cir. 1994) (per curiam).

. Notwithstanding our disagreement with the district court’s analysis, we would like to recognize the tremendous effort that the district court expended in handling a multidistrict litigation of this scale.

. The Dissent disputes both plus factors by emphasizing the absence from the complaints of 'a statement in the body shops’ brief: that the insurance companies used identical “scripts” to steer insureds away from non-compliant shops. See Dissent at 1274-75. Also, the Dissent emphasizes that "the body shops' [brief] takes undue liberties in construing the allegations that can be fairly read from their pleadings.” Dissent at 1280 n.l. The absence from the complaints of the allegation about “scripts” and other "constructions” of the allegations is inapposite to the soundness of the allegations that are present in the complaint.

. The Missouri complaint contains no claim for quantum meruit.

. As stated above, the allegations about GEI-CO appear only in the New Jersey complaints.

. At the outset, I pause to address two issues regarding the complaints. The first is merely an observation of tire time-worn principle that it is only the factual allegations contained therein which we must accept as true. In my opinion, the body shops’ appellate briefing takes undue liberties in construing the allegations that can be fairly read from their pleadings. The district court dismissed these claims-without prejudice and, therefore, the body shops had an opportunity to amend their complaints to include any additional allegations that may have been omitted from their initial pleadings. Having chosen not to do so, they are not permitted to simply "insert” new allegations through their .appellate briefing. These gaps—between the allegations of the complaints and the allegations of the appellate briefing—are discussed, where relevant, below.
Secondly, I note that this appeal is a consolidation of five cases and, therefore, there are five complaints in the record. References in this.opinion to, the "complaints” can be considered a collective reference to all of them. References to a "complaint” and citations to "Compl. at ¶ X” are to the complaint in the New Jersey case filed by Quality Auto Painting Center of Roselle, Inc., which is, in relevant part, representative of the other four complaints,