[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12064

_____

D.C. Docket No. 1:17-cv-02828-MHC

ROSALBA CISNEROS,
On behalf of herself and all others similarly situated,

Plaintiff - Appellant,

versus

PETLAND, INC.,
BKG PETS, INC.,
PETS BKG LLC,
PAWSITIVE SOLUTIONS, INC.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 25, 2020)

Before BRANCH and MARCUS, Circuit Judges, and UNGARO,[*] District Judge

MARCUS, Circuit Judge:

In December 2015, Rosalba Cisneros bought a puppy from a Petland franchise in Kennesaw, Georgia ("Petland Kennesaw").  Less than a week later, it was dead.  The question before us is whether Cisneros has plausibly alleged that her puppy's death was the result of a nationwide racketeering conspiracy.

Cisneros brought this case pursuant to the civil provisions contained in the Racketeer Influenced and Corrupt Organizations Act ("RICO"), a statute originally designed to combat the mafia.  Since its passage, the Supreme Court has recognized that RICO is a broad statute that offers the government and private plaintiffs remedies against organized criminal malfeasance in many forms.  But it cannot be invoked every time a group of people causes an injury.  RICO's punitive power -- treble damages, in the civil context -- is necessarily cabined by a series of elements established by its terms and refined in its case law.  To survive a Rule 12(b)(6) motion to dismiss, a civil plaintiff must plausibly allege each of these elements.

Two elements are particularly relevant here.  First, the plaintiff must plead the existence of a RICO "enterprise."  Second, the plaintiff must plead that each

---

[*] Honorable Ursula Ungaro, United States District Judge for the Southern District of Florida, sitting by designation.

defendant engaged in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity involving at least two predicate criminal acts. On these elements, Cisneros's complaint does not pass muster. Her complaint fails to plead facts that plausibly support the inference that the defendants shared a common purpose to commit the massive fraud she alleges. Moreover, as we see it, Cisneros has failed to allege with particularity that each defendant engaged in a pattern of racketeering activity. For these reasons, neither Cisneros's substantive RICO claim nor her RICO conspiracy claim can proceed. Accordingly, we affirm the judgment of the district court dismissing Cisneros's RICO complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

After resolving Cisneros's federal claims in favor of the defendants, the district court declined to exercise supplemental jurisdiction over Cisneros's state-law claim under Georgia's RICO statute. It should not have done so. Cisneros adequately alleged in her complaint that the Class Action Fairness Act vested the district court with original jurisdiction over this claim. On the merits, however, we agree that Cisneros's Georgia RICO claim must be dismissed for the same reasons that the federal RICO claims were dismissed. Thus, we vacate the portion of the district court's order declining to exercise supplemental jurisdiction and remand with instructions to dismiss Cisneros's state-law RICO claim with prejudice.

The facts of this case tell a sad story.  To be clear, our holding expresses no view on Cisneros's depiction of the practices of Petland and its affiliates, and we are sympathetic to Cisneros and the loss of her puppy.  Cisneros's complaint paints a troubling picture of animal abuse and neglect, consumer deception, and aggressive sales practices, particularly at Petland Kennesaw.  We hold only that RICO does not provide Cisneros, as she has pled this case, the remedy she seeks.

I.

According to her complaint, on December 10, 2015, Rosalba Cisneros purchased a Shih Tzu puppy named Giant from Petland Kennesaw, a Kennesaw, Georgia franchise of Petland, Inc. ("Petland"), for $2,400.  The store was owned and operated by BKG Pets, Inc. and Pets BKG, LLC.  Cisneros alleges that at the point of sale she received a "Certificate of Veterinary Inspection" from Petland Kennesaw that certified Giant was healthy, fit for adoption, and free of parvovirus, an often lethal disease found in puppies.  She also received and signed a purchase contract, attached to her complaint.  That contract (1) entitled Giant to free, post-purchase veterinary care with Dr. Walton Waller at his clinic, My Pets Vet; (2) provided for a refund or a replacement pet under certain circumstances; and (3) warrantied against the development of certain diseases, including parvovirus, within a ten-day window.  The contract also identified PAWSitive Solutions, Inc. ("PAWSitive") as Cisneros's point of contact for major issues arising from the

purchase of the puppy.  Although PAWSitive was allegedly represented to Cisneros by Petland Kennesaw as a "Concern Specialist," Cisneros claims that it advertises itself to pet stores as "more [of] a business consultant, to help pet store owners increase their profitability, than . . . a service company."

Problems arose with Giant's health immediately.  Cisneros alleges that the puppy was sick from the moment she took him home, and she brought him to Dr. Waller on December 14, 2015.  Dr. Waller prescribed antibiotics without making a diagnosis, but after Giant showed no improvement, Cisneros took him to a third-party emergency veterinarian on December 15.  That veterinarian diagnosed the dog as suffering from parvovirus and, as required by state law, reported the diagnosis to the Georgia Department of Agriculture ("GDOA").  Cisneros called Petland Kennesaw, which told her to take Giant to Dr. Waller if she wanted the costs of treatment reimbursed.  She did so.  Dr. Waller allegedly provided no treatment and told a GDOA investigator that Giant had liver disease.  Giant died sometime between December 16 and December 19, 2015.

Cisneros does not know the exact date of the puppy's death because she did not learn of his demise until she received a report from the Georgia Department of Agriculture on December 21, 2015.  Cisneros's daughter recovered Giant's body from Dr. Waller later that day, but only after calling the police to challenge his office's claim that it no longer had the pet.  Upon receiving the body, Cisneros

discovered that Dr. Waller had removed the puppy's organs, a practice which the complaint tells us is "not usual or customary." Meanwhile, PAWSitive had called Cisneros on December 19, told her that Giant's health was improving, and sold her an American Kennel Club registration for approximately $100.

From these facts, Cisneros concluded that what happened to Giant was no accident but rather the intended result of a nationwide conspiracy between Petland; all of its franchisees, including Petland Kennesaw (the only franchisee mentioned by name); PAWSitive; and a network of preferred veterinarians such as Dr. Waller to sell sick puppies for premium prices and engage in a campaign of obfuscation after the sale to aid Petland in avoiding its warranties. The remainder of her complaint is dedicated to alleging the contours of the purported conspiracy, which she describes this way. Cisneros alleges that the franchisor, Petland, supervises and manages this scheme through tight control of its franchisees. The franchisees allegedly purchase unhealthy puppies from "puppy mills" for approximately $50 to $200, pay a network of "preferred veterinarians" a flat fee to literally rubber-stamp certificates stating that the animals are healthy, and sell the puppies to unwitting customers for thousands of dollars. When customers buy these puppies, they receive sales documents allegedly designed to lend legitimacy to the sale and distract from the fraud. After the sale, the preferred veterinarians downplay

6

illnesses while PAWSitive discourages independent veterinary care and distracts customers with other product sales.

Cisneros raised these claims in this class action complaint filed on behalf of herself and all other purchasers of puppies or kittens from Petland franchises across the country from July 2013 to the present. Her complaint named Petland, Petland Kennesaw, and PAWSitive as the defendants and broadly asserted three claims: (1) a violation of the federal RICO statute, 18 U.S.C. § 1962(c); (2) a conspiracy to violate the federal RICO statute, 18 U.S.C. § 1962(d); and (3) with respect to a Georgia subclass of persons who purchased a cat or dog from a Petland franchise in Georgia from July 2013 to the present, a violation of Georgia's state RICO statute, O.C.G.A. § 16-14-4. The district court dismissed Cisneros's federal causes of action for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), and declined to exercise supplemental jurisdiction over her remaining state-law claim, pursuant to 28 U.S.C. § 1367(c).

This timely appeal followed.

## II.

We review a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim de novo. Almanza v. United Airlines, Inc., 851 F.3d 1060, 1066 (11th Cir. 2017). In so doing, we "accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff."

7

Id.  To survive a motion to dismiss, however, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  We may affirm "on any ground that is supported by the record."  United States v. Elmes, 532 F.3d 1138, 1142 (11th Cir. 2008).

Cisneros's first count alleges that the defendants and the preferred veterinarians conducted or participated in a RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).  RICO was enacted in 1970 and prohibits racketeering activity connected to interstate commerce.  See Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1348 (11th Cir. 2016).  The statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  The statute created a civil cause of action in addition to its criminal proscriptions.  Thus, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he

8

sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).

The Supreme Court has made it clear that, although originally enacted to combat organized crime, RICO's application is not limited to conduct that is "characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator, that is, of an association dedicated to the repeated commission of criminal offenses."  H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 243 (1989).  Rather, "the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes."  Boyle v. United States, 556 U.S. 938, 944 (2009) (quotation omitted).  A private plaintiff suing under the civil provisions of RICO must plausibly allege six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff.  See Ray, 836 F.3d at 1348. If a plaintiff fails to adequately plead any one of these elements, she has failed to state a claim upon which relief may be granted, and her complaint must be dismissed.  Fed. R. Civ. P. 12(b)(6).  In this case, the alleged predicate acts included violations of the federal mail and wire fraud statutes.  18 U.S.C. §§ 1341, 1343.

9

The district court found that Cisneros failed to plausibly allege a RICO enterprise. We agree. A RICO enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Cisneros alleges that Petland; its franchisees, including but not limited to Petland Kennesaw; the preferred veterinarians; their clinics; and PAWSitive formed an "association-in-fact" enterprise. An "association-in-fact enterprise is simply a continuing unit that functions with a common purpose." Boyle, 556 U.S. at 948. To plead an association-in-fact enterprise, the Supreme Court has held that a plaintiff must allege that a group of persons shares three structural features: "(1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" Almanza, 851 F.3d at 1067 (quoting Boyle, 556 U.S. at 944, 946). Although "the very concept of an association in fact is expansive," Boyle, 556 U.S. at 944, these requirements make pleading an association-in-fact enterprise "more challenging," Almanza, 851 F.3d at 1067. Here, Cisneros has failed to plausibly allege that the participants in her purported RICO enterprise shared a qualifying purpose.

The purpose prong contemplates "a common purpose of engaging in a course of conduct" among the enterprise's alleged participants. United States v. Turkette, 452 U.S. 576, 583 (1981). An abstract common purpose, such as a

10

generally shared interest in making money, will not suffice. See Ray, 836 F.3d at 1352–53, 1352 n.3 (observing that the "common purpose of making money" would not be sufficient to find an association-in-fact enterprise between Spirit Airlines and outside vendors who merely provided "anodyne services"). Rather, where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct. See Williams v. Mohawk Indus., Inc., 465 F.3d 1277, 1284–85 (11th Cir. 2006) (finding sufficient a common purpose of making money by hiring undocumented immigrants), abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 714–15 (11th Cir. 2014); see also United States v. Pipkins, 378 F.3d 1281, 1290 (11th Cir. 2004) ("Pipkins agreed to participate in an enterprise, the overall objective of which was to make money prostituting juveniles."), vacated, 544 U.S. 902 (2005), reinstated, 412 F.3d 1251 (11th Cir. 2005); United States v. Starrett, 55 F.3d 1525, 1545 (11th Cir. 1995) (explaining that "an association's devotion to making money from repeated criminal activity demonstrates an enterprise's common purpose of engaging in a course of conduct" (quoting United States v. Church, 955 F.2d 688, 698 (11th Cir. 1992))).

Cisneros has alleged no facts that plausibly support the inference that the defendants were collectively trying to make money in pet sales by fraud, which is a

11

common purpose sufficient to find a RICO enterprise, see Williams, 465 F.3d at 1284–85, as opposed to the "obvious alternative explanation," Twombly, 550 U.S. at 567, that they were simply trying to make money in pet sales, which is not, see Ray, 836 F.3d at 1352–53.

As for the franchisor, Petland, Cisneros's allegations offer no basis for inferring that it shared a fraudulent purpose with its franchisees, and her allegations go no further than suggesting that Petland operated a franchise model like that of many legitimate businesses.  Thus, for example, while Cisneros alleges at the highest order of abstraction that the participants shared a common "purpose of implementing Petland's scheme to defraud customers," the only facts she offers to support this assertion with respect to Petland are that, as a franchisor, it "insists upon 'uniform standards, methods, techniques, and expertise, procedures, and specifications . . . for establishing, operating, and promoting a retail pet business," and that it has a "unique system" that it imposes on franchisees through "extensive" training.  But these allegations simply describe an anodyne franchise business model, not a common purpose to defraud.  Indeed, allegations like these could be made about countless law-abiding companies, and nothing about the allegations remotely suggests fraud.  Instead, to have plausibly alleged a common purpose of fraud, Cisneros would have had to allege concrete facts giving rise to the inference that the "unique system" Petland used to train its franchisees was a

12

fraudulent one.  And she has not done so, except in the most sweeping, general, and conclusory fashion.

Notably, Cisneros does not allege the substance of any training or communication between Petland and its franchisees, let alone that the franchisor trained or abetted its franchisees to commit fraud in any way.  Nor does the complaint say that Petland directed the selection of any preferred veterinarians, nor how pet exams were to be conducted, nor how franchisees were to set prices for the pets they sold, nor even that Petland played any role at all in veterinary care.  Indeed, the complaint does not even identify a single so-called "puppy mill" utilized by Petland.

Cisneros's allegations against PAWSitive fare no better.  Cisneros purports to substantiate PAWSitive's alleged purpose of fraud by showing only that the company represents itself differently to consumers than it does to pet stores.  Specifically, she alleges that "Petland . . . requir[es] customers to . . . agree[] that PAWSitive is the 'first resource' for any concerns about their pet's health" and that "PAWSitive is an independent advisor staffed with 'specialists' ready to help with animals' and customers' problems."  At the same time, Cisneros says, PAWSitive advertises itself to pet stores "more as a business consultant, to help pet store owners increase their profitability, than it does a service company."  But these allegations do not support a common purpose on PAWSitive's part to participate in

13

any fraud.  Indeed, there is nothing inconsistent or even particularly suspicious about a company both helping customers with their pets and helping pet stores improve their profits.  Absent any concrete factual allegations suggesting that PAWSitive did not merely help Petland improve its profits but shared a common purpose with Petland to improve those profits by fraud, Cisneros has failed to allege that PAWSitive had a RICO-qualifying common purpose.

Moreover, the complaint is wholly devoid of factual allegations suggesting PAWSitive's purposeful involvement in the allegedly fraudulent activities of the franchisees, including Petland Kennesaw.  For instance, the complaint contains no allegation that PAWSitive received any money in connection with the alleged scheme to defraud other than what Cisneros directly paid it in exchange for her American Kennel Club registration, that PAWSitive did anything that would be unexpected for a third-party pet care point of contact, or that it improperly insisted Cisneros seek treatment with Dr. Waller or played any role in his treatment of Giant.  Indeed, Cisneros's allegations do not suggest any involvement of PAWSitive in the alleged enterprise until after the sale, and she does not explain how the facts of its limited role in Cisneros's experience suggest a common purpose to further -- or even knowledge of -- the allegedly fraudulent nature of the sale.

Most of Cisneros's complaint dwells on Petland Kennesaw's sales practices and her experiences with them. But even here, Cisneros has failed to allege concrete facts from which the inference may plausibly be drawn that Petland Kennesaw shared a common purpose to defraud with the other participants of the purported association-in-fact enterprise. For instance, although Cisneros concretely alleges that Petland Kennesaw "pays the preferred veterinarians a fixed rate each month," she offers only the most conclusory claim that these payments are "in exchange for their agreement to certify . . . that each animal is 'healthy' and 'fit for adoption.'" Other than this conclusory and unsupported assertion, there is nothing in the complaint to support the claim. Indeed, the complaint does not allege that Petland Kennesaw directed Dr. Waller to falsify the health exam, that all or even most of Dr. Waller's health exams were fraudulent, or that Petland Kennesaw knew that Dr. Waller was lying when he represented that he was conducting health exams. Instead, Cisneros's complaint describes only an unexceptionable relationship between the franchise and the veterinarians -- Petland Kennesaw pays the veterinarians, and the veterinarians provide pet care to customers.

Similarly, while Cisneros's complaint describes at length what she believes to be the fraudulent purpose of Petland Kennesaw's sales practices, she offers no factual allegations from which we could infer that Petland Kennesaw decided on

15

this purpose together with the franchisor, Petland, or PAWSitive.  The complaint

contains no allegations about specific interactions between Petland Kennesaw and

the other defendants, nor allegations regarding the origins or scope of the alleged

scheme.  Rather, Cisneros simply asks us to speculate that Petland Kennesaw

decided at some point to pursue fraud, and that PAWSitive and Petland were

involved in that decision.  We will not indulge that speculation.  Cisneros was

required to allege not just that Petland Kennesaw had a fraudulent purpose, but that

it was a common purpose, formed in collaboration with Petland, PAWSitive, and

the preferred veterinarians.

In an effort to substantiate her theory that the defendants shared a common

purpose to conduct the affairs of an association-in-fact enterprise, Cisneros relies

heavily on the affidavit of Dr. Michael Good, a former preferred veterinarian with

Petland Kennesaw.[1]  In substance, Dr. Good, who worked with Petland Kennesaw

from 1995 to 2005, testified that during his tenure he believed that the

overwhelming majority of pets arrived sick at Petland Kennesaw, that he thought

Petland Kennesaw tried to sell the pets before they became symptomatic, and that

---

[1] Inasmuch as Cisneros quoted from the affidavit in her complaint, and because Petland Kennesaw attached the affidavit to its motion to dismiss, we may consider the whole document in evaluating the adequacy of Cisneros's complaint.  See Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1284 (11th Cir. 2007) (permitting courts to consider documents "beyond the face of the complaint" in ruling on a Rule 12(b)(6) motion to dismiss, where the "plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss").

16

he ended his relationship with Petland Kennesaw after its owners told him to stop telling customers their pets were sick, even when they were.  But Dr. Good's affidavit does not bring Cisneros's conspiracy theory across "the line between possibility and plausibility."  Twombly, 550 U.S. at 557.

For starters, the affidavit makes no mention of PAWSitive, and it refers to "Petland Corporate" only three times.  Cisneros emphasizes Dr. Good's averment that "Petland Corporate had its own protocol for the treatment and sale of sick animals."  According to Cisneros, this demonstrates the enterprise's common purpose to defraud.  In context, however, the statement reflects only Petland Kennesaw's rejection of Dr. Good's unsolicited suggestion to "hire a veterinarian technician and set up an area in the store where the animals could be processed and examined properly before purchase."  Petland Kennesaw, Dr. Good says, told him in response "that Petland Corporate had its own protocol for the treatment and sale of sick animals."  Thus, the statement offers no basis for inferring that the franchisor's protocol was fraudulent;  it simply reiterates the allegation that Petland mandated uniformity from its franchisees in general.  This fact alone offers no support for the theory that the uniformity Petland mandated involves fraud.

What's more, while Dr. Good's affidavit might be probative in a fraud case against Petland Kennesaw, its value even in that regard would be minimal  because his observations long predate the purchase of Giant, which occurred on December

17

10, 2015, by a decade.  Indeed, Dr. Good ended his relationship with Petland Kennesaw in 2005.  More importantly, however, we are not merely searching for allegations that Petland Kennesaw engaged in fraud.  Cisneros's RICO complaint may only proceed if we can find facts within it that plausibly yield the inference that these defendants and the other participants in the alleged association-in-fact enterprise acted with the common purpose to engage in a scheme to defraud.  See Ray, 836 F.3d at 1352–53 (affirming dismissal of a RICO complaint for failure to allege a common purpose where, even if the defendant had independently committed fraud, the plaintiff failed to plead that the other participants in the alleged enterprise shared a common purpose to do so).  Dr. Good's affidavit does not come close to connecting the dots.  Nor could it have done so, given his departure a decade earlier.

Cisneros nevertheless asks us to infer from Dr. Good's departure in 2005, and from the facts of her own experience, that Petland Kennesaw found in Dr. Waller someone who would do what Dr. Good wouldn't.  But this inference would be wholly speculative.  Dr. Good did not testify in that way, nor could he have.  Moreover, even if Cisneros had sufficiently alleged that Petland Kennesaw conspired with its salespeople and Dr. Waller to defraud her, this would not be enough to substantiate an association-in-fact enterprise.  It is well established that a RICO enterprise must be an entity separate and distinct from any individual

18

defendant -- a person cannot conspire with itself.  See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001).  Thus, "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation."  Ray, 836 F.3d at 1357.

As for Petland Kennesaw, that is all Cisneros has alleged.  The salespeople who consummated the sale of Giant and provided and explained the allegedly fraudulent paperwork were, of course, Petland Kennesaw employees.  And while the complaint alleges that Dr. Waller's clinic, My Pets Vet, is formally a distinct entity, the complaint makes clear that Waller acted as an agent of Petland Kennesaw in perpetrating the alleged fraud -- fraudulently completing the health exam in exchange for a monthly payment and calling Petland Kennesaw for specific direction in treating Giant.  To the extent it is probative at all, Dr. Good's affidavit supports the existence of an agency relationship, inasmuch as he said that part of the reason he ended his relationship with Petland Kennesaw was its efforts to dictate what he told customers in the course of veterinary practice.  Thus, even if Cisneros's complaint were sufficient to allege fraud against Petland Kennesaw, she has not alleged the existence of an association-in-fact enterprise distinct from Petland Kennesaw itself.

19

In the end, Cisneros has alleged only that Petland operates a franchise business like any other franchisor.  And even if we were to assume Cisneros has adequately alleged fraud on the part of one franchisee, Petland Kennesaw, the existence of a franchise agreement on its own does not allow us to infer that Petland shared with the franchisee a common purpose to defraud.  Nor has Cisneros alleged any facts permitting an inference that PAWSitive shared a common purpose to defraud with anyone else.  For these reasons, Cisneros has failed to plausibly plead a common purpose to engage in fraud among the defendants and, therefore, she has not adequately pled the existence of an association-in-fact RICO enterprise.  Her complaint fails to state a claim for a violation of 18 U.S.C. § 1962(c).

## III.

Cisneros's complaint fails to state a claim for a wholly independent reason: she has not pled with particularity that the defendants engaged in a pattern of racketeering activity consisting of at least two predicate acts of fraud.  Beyond establishing the existence of a RICO enterprise, a plaintiff must allege that each defendant participated in the affairs of the enterprise through a "pattern of racketeering activity," which requires "at least two acts of racketeering activity." 18 U.S.C. §§ 1962(c), 1961(5).  An act of racketeering activity, commonly known as a "predicate act," includes any of a long list of state and federal crimes.  See 18

20

U.S.C. § 1961(1). A plaintiff must put forward enough facts with respect to each predicate act to make it independently indictable as a crime. See Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1381 (11th Cir. 1997).

Cisneros alleges that the predicate acts committed by the defendants on behalf of the purported enterprise involved the use of the mails and wires in furtherance of a scheme to defraud, in violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. Like any allegation of fraud, Cisneros's alleged predicate acts must satisfy the heightened pleading standards embodied in Federal Rule of Civil Procedure 9(b), which requires the plaintiff to "state with particularity the circumstances constituting fraud." See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1291 (11th Cir. 2010). Thus, to survive a motion to dismiss, Cisneros was required to plead "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiff[]; and (4) what the defendants gained by the alleged fraud." Id.

In addition to alleging the requisite number of individually chargeable predicate acts, a plaintiff must plausibly allege that the defendant is engaged in "criminal conduct of a continuing nature." Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis in original); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14 (1985) (noting that, "while two acts are

necessary, they may not be sufficient"). A plaintiff can do so either by alleging "a series of related predicates extending over a substantial period of time" or "the threat of continuity." H.J. Inc., 492 U.S. at 242 (emphasis omitted). We measure a "substantial period of time" in years, not in weeks. See Jackson, 372 F.3d at 1267 ("The overwhelming weight of case authority suggests that nine months is not an adequately substantial period of time."). To show the "threat of continuity," a plaintiff must allege "either that the alleged acts were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future." Id. (quotation omitted).

Moreover, as our sister circuits have held, independently chargeable instances of mail or wire fraud cannot constitute a "pattern of racketeering activity" when they arise from a single transaction. See Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014) (concluding that "multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern" (quoting Tellis v. U.S. Fid. & Guar. Co., 826 F.2d 477, 478 (7th Cir. 1986))); see also Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 20 (1st Cir. 2000) ("RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."). Because each use of the mails or

22

wires in furtherance of a single instance of fraud is independently indictable under the federal mail and wire fraud statutes, see Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639, 648 (2008), to hold otherwise could make RICO cases out of one allegedly fraudulent transaction.  That would contravene the clear purpose of RICO.  See Jackson, 372 F.3d at 1265 (noting that "the sort of offense that RICO is designed to address" is "one that is part of a pattern of ongoing, continuing criminality").

While alleging in the abstract "thousands" of acts of mail and wire fraud, Cisneros specifically points to only five: (i) Petland Kennesaw charging Cisneros's credit card on December 10, 2015 for the purchase of Giant with the accompanying certification and warranties; (ii) telephone calls to and from Cisneros and Petland Kennesaw, Dr. Waller, and PAWSitive in December 2015; (iii) PAWSitive charging Cisneros's credit card in December 2015 for an American Kennel Club registration; (iv) PAWSitive mailing to Cisneros the materials for the American Kennel Club registration; and (v) Dr. Waller calling Petland Kennesaw in December 2015 regarding Giant's medical diagnosis.[2]

---

[2] In her opposition to defendants' motions to dismiss, Cisneros grouped these predicate acts slightly differently and added some not specifically alleged in the complaint.  She repeats some of these additional predicate acts in her reply brief before us.  But because we assess whether her complaint, and not her arguments, states a claim for relief, these predicate acts are not properly before us.  See Fin. Sec. Assur., Inc., 500 F.3d at 1284 ("Ordinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss.").

A.

For starters, none of these alleged predicate acts so much as mention the franchisor, Petland, much less allege with particularity when and how it committed mail or wire fraud or otherwise aided and abetted the commission of mail or wire fraud. The complaint, therefore, could not allege Petland's participation in the predicate acts, required for RICO liability. To avoid this conclusion, Cisneros argues for the first time in her reply brief that Petland Kennesaw's first act of wire fraud -- charging Cisneros's credit card for the allegedly fraudulent sale of Giant -- was committed pursuant to Petland's standards and protocols. But this argument -- even if we were to consider arguments Cisneros raised for the first time in her reply brief -- does not itself provide the specificity required by Rule 9(b). That is, even in her reply brief, Cisneros still fails to describe the who, what, when, where, and how of Petland's participation in the allegedly fraudulent sale.

Moreover, blending the identities of the defendants in her allegations of fraud -- expecting us to read Petland's complicity into an allegation that specifically names only Petland Kennesaw -- is precisely the kind of vagueness in fraud pleadings Rule 9(b) was designed to prevent. See Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1317 (11th Cir. 2007) (affirming dismissal of civil RICO claims where plaintiff "lumped together" defendants in alleging predicate acts of fraud). Under Rule 9(b), we will not scour the allegations of a

complaint to link unnamed defendants to particular acts of fraud without some reasoned and plausible way to do so.

And finally, even if we accept that Cisneros sufficiently alleges Petland's participation in the sale of Giant, this could constitute only one predicate act -- still insufficient to establish the pattern of racketeering activity required for RICO liability.

B.

Next, Cisneros's complaint identifies by date and time three alleged predicate acts of wire fraud committed by Petland Kennesaw: (1) charging her credit card at the point of sale; (2) telling her over the telephone to take Giant to Dr. Waller if she wanted the costs of treatment to be fully reimbursed; and (3) a call from Dr. Waller to Petland Kennesaw when Cisneros's daughter arrived to collect Giant's body.  Each of these incidents involved the use of the wires.  But they could be predicate acts of wire fraud only if Cisneros alleged with particularity that they were committed in furtherance of a scheme to defraud.  See Bridge, 553 U.S. at 647 (noting that the "gravamen of the offense is the scheme to defraud"); see also Am. Dental, 605 F.3d at 1292 (dismissing a RICO complaint where it "provides a list of mailings and wires, without ever identifying any actual fraud").

25

We have our doubts that Cisneros has alleged with sufficient particularity that Petland Kennesaw committed fraud in selling her Giant. Her essential theory on that score is that (1) the store certified Giant as healthy when it knew he was not; (2) she paid money on the basis of that representation; and (3) Giant died shortly thereafter, depriving her of the certified-healthy dog for which she paid. But the sales documents Cisneros attached to her complaint appear to belie that theory. See Crenshaw v. Lister, 556 F.3d 1283, 1292 (11th Cir. 2009) ("It is the law of this Circuit that when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." (quotation omitted)). In stark contrast to Cisneros's conclusory assertions, the purchase contract Cisneros attached to her complaint, a one-page document which she appears to have e-signed in six separate locations on the date of sale, does not anywhere "certify" that Giant was healthy or free of parvovirus. Much the opposite -- the contract specifically warranted that if any veterinarian diagnosed Giant with parvovirus within ten days of the purchase, Petland Kennesaw would either treat Giant free of charge at My Pets Vet, reimburse Cisneros up to 25% of the costs of treatment with any other veterinarian, or give her a replacement pet of equal value. Cisneros's e-signature, dated as of the sale, appears below the paragraph describing the terms of this warranty.

26

Taking the allegations in her complaint as true, there is no doubt that Cisneros's case falls squarely within Petland Kennesaw's ten-day warranty. Cisneros purchased Giant on December 10, a third-party veterinarian diagnosed parvovirus on December 15, and Giant was dead no later than December 19. Yet Cisneros has nowhere alleged that Petland Kennesaw refused to honor the warranty, misled her about its terms, or otherwise prevented her from taking advantage of it. She did not even allege that she tried to compel Petland Kennesaw to honor the warranty, despite possessing both a copy of the relevant contract and proof of Giant's parvovirus diagnosis (in the form of the GDOA report) within the applicable time period. Cisneros failed to plead with particularity -- or indeed even to suggest -- that Petland Kennesaw did not comply with the warranty for which she qualified.

Of course, the mere existence of warranty language in a sales contract does not foreclose the possibility that Petland Kennesaw committed fraud. The store could have refused to honor the warranty on fraudulent grounds, it could have lied to Cisneros about the warranty's terms to induce her not to pursue her rights, or it could have signed the contract with her name and not told her about the warranty it contained. But if Petland Kennesaw didn't do any of these things and didn't in some other way fraudulently prevent Cisneros from receiving the replacement pet to which she was entitled, it is unclear how the store could have been involved in a

27

scheme to defraud her by selling a sick pet it knew it would have to pay to treat or replace. And not a single allegation in Cisneros's 57-page complaint even remotely suggests -- much less pleads with particularity -- that Petland Kennesaw committed fraud with respect to the ten-day warranty.

But even assuming that Cisneros has adequately pled fraud on the part of Petland Kennesaw, she has not alleged that its predicate acts constituted a pattern of racketeering activity. Indeed, all three alleged instances of wire fraud took place in an eleven-day period between when she purchased the puppy on December 10, 2015 and when her daughter retrieved its body on December 21, 2015. Thus, these predicate acts do not come close to extending over a "substantial period of time" -- we have held that nine months is not a substantial enough timeframe in this context. Jackson, 372 F.3d at 1267. Nor does Cisneros allege that anything about them specifically suggests the continued threat of fraud to herself or others. See H.J. Inc., 492 U.S. at 242. She does not, for example, allege that Petland Kennesaw intended to fraudulently sell her another pet, that it told her that her experience was typical, or that it would feel the need to perpetrate other crimes to cover up its alleged fraud. And Cisneros has alleged no concrete facts to support her sweeping, conclusory allegation that wire fraud is part of Petland Kennesaw's regular way of doing business -- indeed, she has not specifically pointed us to a single other person whom Petland Kennesaw allegedly defrauded. What's more,

28

all three predicate acts arise from a single transaction -- the sale of Giant on December 10, 2015 -- and therefore cannot constitute a "pattern of racketeering activity." See Crawford, 758 F.3d at 489; Efron, 223 F.3d at 20; Tellis, 826 F.2d at 478.

In short, Cisneros has failed to plead with particularity how Petland Kennesaw could have engaged in a scheme to defraud when its supposed scheme apparently compelled it (rather than her, the victim) to be on the hook for the costs of the fraud. And moreover, even if she had adequately pled that Petland Kennesaw committed fraud, she has not alleged that it engaged in a pattern of racketeering activity. Thus, Cisneros has failed to state a RICO claim against it.

C.

Finally, Cisneros alleges that PAWSitive committed three predicate acts of mail or wire fraud: (1) selling Cisneros an American Kennel Club registration over the phone; (2) charging her credit card for the sale; and (3) mailing her the materials related to that registration. At the outset, since we doubt that Cisneros adequately alleged that Petland Kennesaw engaged in a scheme to defraud, we struggle to discern how PAWSitive's uses of the mails and wires could have been in furtherance of that scheme. Nevertheless, even assuming that Cisneros sufficiently alleged that PAWSitive's sale of the registration was independently

fraudulent, the predicate acts she alleges do not constitute a pattern of racketeering activity.

All three of PAWSitive's predicate acts emerge from a single phone call on December 19, 2015. During that call, Cisneros claims a PAWSitive representative "falsely stated that Giant was improving and would be released from Waller's care the following week" and sold Cisneros the American Kennel Club registration, which it shipped eleven days later. But Cisneros has not alleged the commission of any predicate acts outside this eleven-day period; nor has she pointed us to anything in the predicate acts themselves that suggests PAWSitive will continue to defraud her or anyone else; nor has she offered any concrete facts that would support her allegation, made only at the highest order of abstraction, that fraud is part of PAWSitive's regular way of doing business. Moreover, once again, these three acts of mail or wire fraud, although separately indictable, arise from a single transaction -- the allegedly fraudulent sale of the American Kennel Club registration. Thus, Cisneros has failed to allege that PAWSitive engaged in a pattern of racketeering activity, and her RICO claim against it must be dismissed.

## IV.

Cisneros's second count is a RICO conspiracy claim, which alleges that the defendants conspired to commit the substantive RICO offense we've already discussed, in violation of 18 U.S.C. § 1962(d). A RICO conspiracy can be found

through "the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Browne, 505 F.3d 1229, 1264 (11th Cir. 2007) (quoting United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005)).  But of course, "parties cannot be found guilty of conspiring to commit an act that is not itself against the law." Jackson, 372 F.3d at 1269.  And a complaint that "simply concludes that the defendants conspired and confederated to commit conduct which in itself does not constitute a RICO violation" must be dismissed. Id. (quotation omitted).

That is what Cisneros has done here.  Her complaint simply concludes that "[t]he nature of the above described acts . . . give[s] rise to the inference" that the defendants conspired to violate 18 U.S.C. § 1962(c).  In her reply brief, Cisneros concedes that her arguments with respect to the RICO conspiracy charge are identical to those she makes with respect to the substantive RICO count.  Because she has failed to adequately allege an association-in-fact enterprise or a pattern of racketeering activity, her RICO conspiracy claim must also fail.

## V.

Finally, Cisneros seeks to represent a subclass of individuals who purchased a dog or cat from a Petland franchise in Georgia from July 2013 to the present in a more limited class action for violation of Georgia's RICO statute, O.C.G.A. § 16-14-4.  After dismissing Cisneros's federal claims, the district court declined to

exercise supplemental jurisdiction over this state claim and dismissed it without prejudice.  But because the Class Action Fairness Act ("CAFA") vested the district court with <u>original jurisdiction</u> over this claim, "there was no need for it to analyze supplemental jurisdiction."  <u>Wright Transp., Inc. v. Pilot Corp.</u>, 841 F.3d 1266, 1272–73 (11th Cir. 2016).  Where a district court has original jurisdiction over a claim under CAFA, there is no supplemental jurisdiction and it is error for a court to decline to exercise its jurisdiction.  <u>See</u> <u>id</u>. at 1273 (noting that "[s]upplemental jurisdiction does have a role in CAFA cases, but only in those that also have 'state-law claims that were never subject to CAFA jurisdiction'" (quoting <u>In Touch Concepts, Inc. v. Cellco P'ship</u>, 788 F.3d 98, 102 (2d Cir. 2015)); <u>see also</u> <u>Cotroneo v. Shaw Env't & Infrastructure, Inc.</u>, 639 F.3d 186, 195 (5th Cir. 2011) ("Given that the claims actually arise under federal law . . . the district court had original, rather than supplemental, jurisdiction over them.  As such, the district court could not decline to exercise that jurisdiction.").

CAFA vests district courts with diversity jurisdiction over putative class actions where (1) the proposed class has 100 or more members; (2) at least some members of the proposed class have different citizenship from some defendants; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.  28 U.S.C. § 1332(d)(2), (6).  Cisneros's complaint adequately alleged each of these requirements.  The appellees do not argue otherwise.  Instead, they

say Cisneros has waived CAFA jurisdiction because she "did not raise this issue in the District Court at all." We disagree. Cisneros alleged that the district court had original jurisdiction under CAFA in her complaint; it was the defendants who failed to dispute this allegation in their motions to dismiss.

Nevertheless, on the merits, Cisneros's Georgia RICO claim falls short. The federal and Georgia RICO acts are "'essentially identical,' meaning failure to state a claim under the federal act warrants dismissal under the Georgia act." Feldman v. Am. Dawn, Inc., 849 F.3d 1333, 1342 (11th Cir. 2017) (quoting Simpson, 744 F.3d at 705 n.1). Cisneros says she has found one distinction between the two -- the Georgia statute does not require proof of an enterprise. See Cobb County v. Jones Grp. P.L.C., 460 S.E.2d 516, 520–21 (Ga. Ct. App. 1995). Thus, she argues, our conclusion that she has failed to plead the existence of an enterprise for federal purposes does not compel dismissal of her state-law claim. Her argument is unavailing.

Cisneros's characterization of the Georgia RICO statute is misleading. One part of the Georgia RICO statute, O.C.G.A. § 16-14-4(a), does not require proof of an enterprise. See Cobb County, 460 S.E.2d at 520–21. This subsection, which prohibits the use of racketeering proceeds to acquire interest in property, is analogous to but broader than 18 U.S.C. § 1962(b). Cisneros's federal claim, however, only alleges violation of § 1962(c) (and conspiracy to violate § 1962(c)).

33

The Georgia provision analogous to § 1962(c), O.C.G.A. § 16-4-4(b), prohibits conducting or participating in an enterprise and does require proof of an enterprise. See Kimbrough v. State, 799 S.E.2d 229, 233 (Ga. 2017).

While Cisneros alleges, again at the highest order of abstraction, that the defendants violated O.C.G.A. § 16-14-4(a)–(c), nowhere in her complaint does she allege facts that specifically bear on § 16-14-4(a). Her generic allegation that the defendants violated § 16-14-4(a) is no more than the "formulaic recitation of the elements of a cause of action," insufficient to survive a motion to dismiss. Twombly, 550 U.S. at 555. And she has failed to state a claim under § 16-14-4(b) for the same reason she has failed to state a claim under § 1962(c): she failed to plausibly plead the existence of an enterprise.

In any event, Cisneros's failure to plead the existence of an enterprise is not the only inadequacy in her complaint that mandates its dismissal. She also failed to plead a pattern of racketeering activity through predicate acts of mail and wire fraud, which independently requires the complaint to be dismissed under the Georgia RICO statute. See Feldman, 849 F.3d at 1342. Thus, we vacate the portion of the district court's order declining to exercise supplemental jurisdiction and remand with instructions to dismiss this claim too with prejudice.

34

For these reasons, we **AFFIRM** the district court's dismissal of Cisneros's federal claims, **VACATE** its dismissal of her state-law claim, and **REMAND** with instructions to dismiss that claim with prejudice.